HARDING GLASS COMPANY *v.* ARK. PUBLIC SERVICE COMMISSION.

5-1542                                      313 S. W. 2d 812

Opinion delivered June 2, 1958.

*Charles B. Johnson,* Clarksburg, West Va.; *Reuben Goldberg,* Washington, D. C.; *Hardin, Barton, Hardin & Garner,* for appellant.

*Claude Carpenter, Jr.,* for appellee; *Thomas Harper,* for intervener.

SAM ROBINSON, Associate Justice. This is a rate case. On the 5th day of October, 1956, the Fort Smith Gas Corporation (the Gas Company) filed an application for a change of rates for a supply of gas to industrial consumers in the city of Fort Smith, the surrounding area and other communities. The Gas Company sought to increase the price from 16.38 cents per Mcf to 20.62 cents. After extensive hearings the Commission granted the requested new schedule of rates on May 17, 1957. The protestants took an appeal to the Pulaski Circuit Court, where the action of the Commission was affirmed, and the protestants have appealed to this Court. The principal contention of appellants is that the Commission accepted the contract price for gas supplied by the Stephens Production Company (Stephens) to the Gas Company, the Commission refusing at the time of the hearing to investigate the merits of that contract. Appellants maintain that Stephens is an affiliate of the Gas Company and in these circumstances the Commission should not have accepted the contract price as between Stephens and the Gas Company as a *bona fide* operating expense.

In 1945 W. R. Stephens bought the controlling interest in the Gas Company. At that time and up until

1953 the Gas Company bought more than 97 per cent of its gas from the Arkansas-Oklahoma Gas Corporation (Arkansas-Oklahoma). This company owned gas production properties and owned a distribution system whereby it supplied gas to the Gas Company at the city gates of Fort Smith and supplied gas and distributed the same in several small towns in Oklahoma and Arkansas. In 1953, the owners of the Arkansas-Oklahoma decided to liquidate that company and put up for sale all of its properties, including the production properties and the distribution systems. In that connection, in an order made on December 22, 1953, which will be referred to again, the Commission made a finding of fact as follows: ''The majority of the common stock of Arkansas-Oklahoma Gas Company has for many years been owned by a group of residents of Fort Smith, Arkansas, and these stockholders have recently expressed a desire to sell the stock and have offered such stock for sale to various interests, including persons not residents of the areas served by the two companies, which caused the owners of the stock of the Fort Smith Gas Corporation and its officers and directors to become concerned as to the continuation of their source of supply of gas from the Arkansas-Oklahoma Gas Company at the termination on December 31, 1965, of the service agreement between the two companies.''

For its supply of gas the Gas Company was almost wholly dependent on a contract with Arkansas-Oklahoma which had only twelve years to run. To protect his Fort Smith Gas Company's source of gas supplies, Stephens made a deal whereby the Fort Smith Gas Company bought the distribution system of Arkansas-Oklahoma, and he and his brother, J. T. Stephens, along with the Northwestern Mutual Life Insurance Company, bought the production properties. Stephens assumed heavy obligations by contracting to maintain and develop the properties and explore for gas at his own expense. This is a hazardous business. There are many dry wells; production may be obtained or it may not. The Northwestern Mutual Life Insurance Company put up $4,-

333,000 to pay Arkansas-Oklahoma. Stephens contracted with the Gas Company to supply gas at the wellhead at 12.7819 per Mcf. The Gas Company had been paying Arkansas-Oklahoma 17.38 at the city gate. All of these transactions were aboveboard and the whole plan was laid before the Oklahoma Public Service Commission, the Arkansas Public Service Commission, and the Federal Power Commission. The Arkansas and Oklahoma Commissions approved the sale, and the Federal Power Commission held hearings and granted the application. The contract between the Gas Company and Stephens was made on March 2, 1954, after the Arkansas Commission, in Docket No. U-902, had found in December of 1953 that the price of 12.7819 per Mcf was reasonable. In its findings and order of May 17, 1957, in the case at bar, Docket No. U-1169, approving the new rate schedule, the Commission referred to its order in Docket No. U-902, wherein the contract was approved. The Commission said: ''This Commission, after full investigation and hearing, from which it was fully developed, as shown by the contract itself, and the exhibits attached to the Company's response to protestants' motion, found that the dedication of the large gas reserves, made a condition of the contract, was essential to the Fort Smith area. The Commission further found that therefore the contract and the contract rate was fair and reasonable, and that in the public interest it was necessary that the contract and the contract rate be approved and the transfer of properties proposed be authorized. Therefore, the Commission, by its order of December 29, 1953, in our Docket No. U-902, approved the contract and the contract rate of 12.7819 cents per Mcf which the protestants here seek to attack.

''Northwestern Mutual Life Insurance Company of Milwaukee, Wisconsin, owner of the Production Payment supported by the gas reserves dedicated under the contract in question, obviously relied on our order in this docket and on the order of the Federal Power Commission approving the transaction in Docket No. G-2332-33 as a basis for accepting the production payment

which made the transaction possible. We have no reason now to recede from the position originally taken by us that our approval of this contract and this transaction was then and now is in the public interest. . . ."

The Commission points out that by reason of the Supreme Court decision in the case of *State of Wisconsin* v. *Federal Power Comm'n.*, 205 F. 2d 706 *(Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672, 74 S. Ct. 794, 98 L. Ed. 1035) (the *Phillips Petroleum Company* case), it has no jurisdiction over the Stephens Production Company, but that it does have jurisdiction over the rates charged by the Gas Company to its customers. The Commission said: "Moreover, even though we do not consider that we have jurisdiction over the price charged the Company under the contract, we do have jurisdiction over the Company's rates to its customers, and having already found the contract price fair and reasonable, we still would consider it so for the purpose of the application here under consideration." Furthermore, the Commission had knowledge of the fact that subsequent to 1953, when the 12.7819 per Mcf was approved, a wellhead price of 16 cents per Mcf had been allowed for gas produced in the same area. The Commission may take notice of a fact of that kind. *Acme Brick Co.* v. *Arkansas Public Service Comm'n.*, 227 Ark. 436, 299 S. W. 2d 208.

Appellants say: "It is not enough that money ($4,-333,000) has in fact been spent; there must be proof that it was wisely, reasonably, and necessarily spent." The spending of this money was approved by the Arkansas Public Service Commission, the Oklahoma Public Service Commission and the Federal Power Commission. It is hard to see how any stronger proof could be produced that the money was wisely, reasonably and necessarily spent.

Appellants further contend: "In view of the ownership and control of Fort Smith and Stephens Production Company, the record in this case in sufficient to support the conclusion that there is in practical effect one organization and that for the purpose of fixing

rates in this case, the amount to be allowed for gas purchased in the cost of service is not the contract price of 12.7819 cents per Mcf, which was not the product of arm's-length bargaining, but only the cost of production of the gas at the wellhead." Even under this theory the Commission must be sustained, because, according to the undisputed testimony in the case, the gas cost Stephens and Northwestern $4,333,000, and when the formula used by Mr. Williams, appellants' expert, is applied to the cost of the gas at the wellhead, $4,333,000 would result in a price for the gas of 13.185 per Mcf.

Appellants say Stephens should have acquired the gas reserves for the Gas Company. According to this theory, some other gas distributing company of which Stephens may be the president could make the same claim. If the Gas Company owned the reserves of gas it would be at the price of $4,333,000, and this amount would be a part of the rate base supporting a price of 13.185 per Mcf. If the $4,333,000 were put in the rate base of the Gas Company and the gas ran out before that much was produced, surely there would be a hue and cry, and rightfully so, about the gas ever having been made a part of the rate base in the first place. The gas purchased by Stephens is under the ground. It cannot be seen, and the amount there is only speculative. Paying $4,333,000 for gas properties that may be depleted before anything like that much is produced is a big gamble, and one that in all probability the Gas Company's customers would not want to take and certainly should not be compelled to take.

There is no serious contention that the rate of 20.62 per Mcf is not fair and reasonable if the price of 12.7819 paid by the Gas Company for gas at the wellhead is fair and reasonable. The order approving the contract, in Docket No. U-902, is made a part of the record, and that order itself shows that the Commission went into the matter thoroughly. Among other things there is this finding: "In order to obtain a dedication of the present gas reserves of the Arkansas-Oklahoma Gas

Company and those gas reserves hereafter developed from its gas properties for the use of the Fort Smith Gas Corporation and the area presently served by it from gas acquired from Arkansas-Oklahoma Gas Company, W. R. Stephens has entered into a contract for the purchase of approximately 82 per cent of the outstanding common stock of the Arkansas-Oklahoma Gas Company, and Arkansas-Oklahoma Gas Company has entered into a contract with Fort Smith Gas Corporation for the sale of its gatherings, transmission and distribution systems. Simultaneously with the transfer of these facilities of the Arkansas-Oklahoma Gas Company to the Fort Smith Gas Corporation, there will be effected a transfer of the gas production properties of Arkansas-Oklahoma Gas Company in liquidation of that company to the Arkansas Valley Mineral Company, Inc., and the Wiltex Corporation, which companies have contracted to furnish gas at the well head to Fort Smith Gas Corporation at the price of 12.7819 cents per m.c.f. . . .'' (The Arkansas Valley Mineral Company, Inc., and Wiltex Corporation contracts were assigned to Stephens.)

The gas purchase contract has been filed as a tariff with the Federal Power Commission. True, the Arkansas Commission may not be bound to accept as part of the rate base of the Gas Company the price named in the contract filed with the Federal Power Commission, but here the Commission had already made a finding that the price named in the contract is reasonable. There is no suggestion that there has been any change in conditions since the Commission approved the contract that would justify a lowering of the price at this time. Under the terms of his contract, which is a part of the record, Stephens must explore and drill for gas. This is necessary to maintain the supply, and it is a matter of common knowledge that labor and materials are much higher now than in 1953, when the contract price of 12.7819 was approved. Even though it costs more to produce gas now than it did in 1953, the contract price of 12.7819 is not being changed, and the increase in

rates is due to the Gas Company's increase in the cost of doing business because of factors other than the cost of gas, which price remains as fixed by the 1953 contract. It is hard to understand how the 12.7819 price paid by the Gas Company could be excessive when, according to the undisputed evidence, in an arm's-length deal, Arkansas-Oklahoma received $4,333,000 for its gas production properties. And when the price of gas sold by Stephens to the Gas Company is based on the $4,333,000 cost, the price, figured by a formula about which no one complains, is 13.185, instead of 12.7819, the price the Gas Company is paying.

Appellant cites authority for the proposition that the Arkansas Commission has the power to fix the rates at which the Gas Company must sell its gas, notwithstanding the Arkansas Commission has no authority to fix the price at which Stephens, who is operating in interstate commerce, must sell to the Gas Company. Authority also is cited to the effect that the Commission's order approving the 12.7819 rate is not *res adjudicata*. But even though the Commission does have the authority to fix the Gas Company's rate, regardless of the price it may be paying Stephens for gas, and notwithstanding the order approving the 12.7819 rate is not *res adjudicata,* still the Commission does not have to disregard the contract price just because it has the power or authority to do so. True the Commission could disregard the contract price between Stephens and the Gas Company and refuse to grant an increase in rates. But, in order to do this the Commission would have to ignore completely the contract it has heretofore approved for the sale of gas to the Gas Company. And, moreover, it would have to ignore the fact that $4,333,000 was paid for the gas properties. Assuming that the Commission could disregard its approval of the contract, the Oklahoma Commission's approval of the contract, the Federal Power Commission's approval of the sale of the properties, and all that has been done on the strength of the contract, the fact remains that $4,333,000 was

paid for the gas. When this purchase price is considered, a wellhead price of 13.185 per Mcf is reached. This is more than the Gas Company is now paying.

It has been suggested that perhaps Arkansas-Oklahoma sold the distribution system for less than it was worth and balanced the transaction by selling the gas properties for more than a fair value. This suggestion is wholly unsound. In the first place, the Commission made a determination of the fairness of the price of the distribution system and set out in its order of December 22, 1953 just how the price was determined. The order provides: ''The price of the properties to be acquired by the Fort Smith Gas Corporation from the Arkansas-Oklahoma Gas Company will be the depreciated book value of such properties as reflected by the books of the Arkansas-Oklahoma Gas Company at the date of the transfer. This depreciated book value is also the depreciated original cost of such properties as determined by the Federal Power Commission and appears to reflect the fair value of the properties to be transferred.'' In the next place, the Gas Company and its alleged affiliate, Stephens, could not gain by a maneuver of that kind, because if the distribution system were sold to the Gas Company for less than its worth, this low price would go into the rate base.

As authority for the contention that the Commission should not accept the contract price for gas between affiliates, appellants cite *Western Distributing Co. v. Public Service Comm'n.*, 285 U. S. 119, 52 S. Ct. 283, 76 L. Ed. 655; *Dayton Power & Light Co.* v. *Public Utilities Comm'n.*, 292 U. S. 290, 308, 54 S. Ct. 647, 78 L. Ed. 1267; *Mississippi River Fuel Corp.* v. *Federal Power Commission*, 252 F. 2d 619; and Re *Amere Gas Utilities Co.*, 1 P. U. R. 3rd 230. It will be observed, however, that in every one of those cases except the *Amere* case there is nothing in the record to show the cost of the gas to the affiliate on the production end of the contract, whereas in the case at bar the Commission knows what the gas cost the affiliate. The distinction is obvious. In the

*Amere* case, in an opinion written, not by a court but by a public service commission, it is not at all clear just what the commission found the facts to be, but in any event the facts in the case at bar bear no resemblance to that case.

This Court, along with the great weight of authority, has held many times that the Commission has broad powers and is vested with wide discretion; that if the order of the Commission is supported by substantial evidence, is free from fraud and not arbitrary, it is the duty of the court to let it stand. In *Dept. of Public Utilities* v. *Arkansas-Louisiana Gas Co.*, 200 Ark. 983, 988, 142 S. W. 2d 213, it is said: ". . . if the Department's order is supported by substantial evidence, free from fraud, and not arbitrary it is the duty of the courts to permit it to stand, even though they might disagree with the wisdom of the order. In such a case our judgment will not be substituted for that of the Department."

And in *Arkansas Power & Light Co.* v. *Arkansas Public Service Comm'n.*, 226 Ark. 225, 226, 289 S. W. 2d 668, it is said: "At the outset we point out certain well defined rules governing this court in reviewing the powers and actions of the Arkansas Public Service Commission in a utility rate case such as is presented here. The Commission must and does have broad powers and is a fact finding body. Our Legislature has delegated and entrusted the administration of Act 324 to the Commission, and not to the courts. . . . Apart from the judicial review that may be resorted to under the Act, it is not for us to advise the Commission how to discharge its functions. When an appeal is taken to the circuit court, that court, as well as this court on appeal from the circuit court, shall not extend the review of the Commission's findings and actions 'further than to determine whether the Department (Commission) has regularly pursued its authority, including a determination of whether the order, or decision under review, violated any right of the complainant under the Constitution of the

United States or of the State of Arkansas.' (Sec. 73-233(d) Ark. Stats.) The circuit court, and this court on appeal, reviews the Commission's findings on the record before the commission, and if we find any substantial evidence to support it, it is our duty to permit the Commission's order to stand if it is not arbitrary and is free from fraud.  *   *   *''

In *Petition of Central Vermont Public Service Corp.*, 116 Vt. 206, 71 A. 2d 576, 578, the court said: ''An administrative agency performing the delegated legislative function of rate making has a broad discretion. Mr. Justice Cardozo, speaking for the United States Supreme Court, said of it: 'Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints. . . . Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed.' ''

In the case at bar there is no suggestion of fraud, and it cannot be said that the Commission's action was arbitrary in any respect. The only real issue in this case is whether the price of 12.7819 for gas paid by the Gas Company to Stephens is reasonable, taking into consideration that the gas cost $4,333,000. The Commission had full knowledge of what the gas cost Stephens and approved as reasonable and fair the price of 12.7819 per Mcf based on substantial evidence of the cost of the gas.

Affirmed.

GEORGE ROSE SMITH, J., dissents.

GEORGE ROSE SMITH, J., dissenting. In this case the Gas Company asks for an increase in its rates. That request carries with it the burden of proving that a higher rate schedule is necessary to afford the company a fair return on its investment. ''When a utility seeks an increase of existing rates, the burden is, of course, on the

utility not only to offer all evidence to justify such increase, but also to comply with all reasonable requests of the Commission for full disclosures. The Commission, in such instances, has not only the prerogative but also the duty to make requirements for full disclosure, since the Commission acts under valid Legislative authority to see that the interests of the public are fully protected.'' *City of Fort Smith* v. *Southwestern Bell Tel. Co.*, 220 Ark. 70, 247 S. W. 2d 474.

The Gas Company, which is wholly owned (except for three qualifying shares) by W. R. Stephens, owns no gas wells and buys more than 97 per cent of its gas from Stephens Production Company, a partnership which is also controlled by W. R. Stephens. These purchases, which in substance are made by Stephens as buyer from Stephens as seller, constitute roughly five eighths of the Gas Company's costs of service and therefore represent what is by far the most important factor in the determination of the company's proper allowance for operating expense.

The purchases in question are made at a price of between twelve and thirteen cents per thousand cubic feet of gas. This price was fixed by a contract which in substance was entered into between Stephens as seller and Stephens as purchaser in 1954. When the Gas Company filed its present application for an increase in rates the protesting consumers, on the basis of facts that I have merely outlined, asked the Public Service Commission to require the utility company to justify the reasonableness of the price it was paying for its gas. That the Commission had the authority to make this inquiry and to allow only a fair price as an operating expense, even though the gas was being sold in interstate commerce, was expressly decided in *Western Distributing Co.* v. *Public Service Commission*, 285 U. S. 119, 52 Sup. Ct. 283, 76 L. Ed. 655.

The consumers' request for a full disclosure of the facts was vigorously opposed by the Gas Company. Its

position was sustained by the Commission, which refused to require the Gas Company to justify the price it was paying for gas, refused to require the Stephens affiliated companies to allow the protestants access to the pertinent books and records, and refused to permit the Gas Company's witnesses to be cross-examined about the reasonableness of the price being paid for gas. In short, the Gas Company was relieved of the burden of proving the most vital element affecting its application for a rate increase, and the consumers were denied the right of cross-examination as an aid to their attempt to sustain a burden of proof that was not really theirs. In my opinion the only issue on this appeal is whether the Commission erred in accepting the Gas Company's contract price and in effectively shutting the door to any inquiry on the subject.

The majority opinion, as I read it, upholds the Commission's ruling on two grounds. First, it is indicated that the present record supports the view that the contract price is in fact a reasonable one. Bearing in mind that this issue or fact has never been explored in an adversary proceeding, I think it a sufficient answer to make these observations:

(a) The price was fixed not at arm's length but in a transaction in which the buyer and the seller were essentially the same person. As the buyer Stephens was under a duty to the consuming public to obtain the gas as cheaply as possible. As the seller Stephens was naturally inclined to obtain as high a price as possible. This conflict of interest is the same as that which rigidly precludes a trustee from selling to himself and certainly suggests that this contract price should be open to scrutiny.

(b) The uncontradicted evidence shows that the contract price was not determined primarily by the market value of the gas. In a somewhat complex transaction Stephens in effect borrowed, without personal liability, $4,335,000 from the Northwestern Mutual Life Insurance Company in order to finance the purchase of the gas-producing properties. The contract price now in dispute was fixed at a rate sufficient to retire this indebtedness

within a certain number of years, the exact period apparently not being shown by this record. This means that if, for example, the gas reserves have an expected life of fifty years and the term of the loan is only twenty-five years, the consuming public will pay the full purchase price, in the form of excessive gas rates, during the first twenty-five years, and Stephens Production Company will emerge as the owner of the gas, which presumably will then again be sold to the public. The majority's suggestion that the extent of the gas reserves is "only speculative" does not seem wholly convincing. I am not persuaded, especially without proof, that a life insurance company would advance more than four million dollars without being certain that the security actually exists and that its value exceeds the amount of the loan.

(c)    At every step of this proceeding the Gas Company has strenuously opposed the consumers' efforts to investigate the fairness of the contract price. I am unable to reconcile this attitude on the part of the utility with its simultaneous insistence that the price is really less than the Commission would be required to fix if the facts were fully disclosed.

(d)    Finally, in my judgment the issue is not whether this incomplete record shows the price to be reasonable but, rather, whether the Gas Company should be required to meet the burden of proof imposed by law. It seems to me idle to speculate upon a question of fact when the proof is admittedly undeveloped.

Secondly, the majority relies upon the fact that the transaction by which Stephens acquired the assets of the Arkansas-Oklahoma Gas Company was approved by the Arkansas Public Service Commission, the Oklahoma Public Service Commission, and the Federal Power Commission. It is of course not contended that those rulings are *res judicata,* for that doctrine does not apply in rate-making matters, which are always open to re-examination.

The trouble with this second ground for affirmance is that the Gas Company has not met the burden of showing

that the earlier proceedings were adversary contests in which the reasonableness of the contract price was at issue. As a public utility the Arkansas-Oklahoma Gas Company was required to obtain the consent of the three commissions before it disposed of its assets and went out of business. That was the issue in those proceedings, which was resolved by a finding that the proposed transfer of ownership was not contrary to the public interest.

There was no reason for the Arkansas Public Service Commission to investigate the contract price, since it was not a rate-making case, and in fact the Commission merely found that the price was "necessary in order to finance the acquisition of the producing properties of the Arkansas-Oklahoma Gas Company," and that it "appears to be reasonable." We were told in the oral argument, without contradiction, that no representative of the consumers was a party to the proceedings, and indeed there was no reason why they should have been represented. As far as the consumers are concerned that proceeding was an uncontested *ex parte* case in which no one involved had the slightest inclination or motive to attack the fairness of the contract price now at issue. In these circumstances the public evidently has had no opportunity to be heard on the question of whether the price is reasonable, and I am firmly of the opinion that that opportunity should have been granted in the present proceeding.