IN THE MATTER OF SUGARLOAF MINING
COMPANY, Permit No. P-272-M-CO
Banco Portugues Do Atlantico *v.* Arkansas Department of
Pollution Control & Ecology

92-409 840 S.W.2d 172

Supreme Court of Arkansas
Opinion delivered November 2, 1992
[Supplemental Opinion on Denial of Rehearing
December 14, 1992.*]

Hays and Brown, JJ., would grant rehearing.

*Harper, Young, Smith & Maurras,* by: *S. Walton Maurras,* for appellant Banco Portugues Do Atlantico.

*Chisenhall, Nestrud & Julian, P.A.,* by: *Ann P. Faitz*; and *Steve Weaver,* for appellee Arkansas Department of Pollution Control and Ecology.

DAVID NEWBERN, Justice. This is an appeal from the final order of the Circuit Court of Sebastian County, Greenwood District, which affirmed Minute Order 91-01 issued by the Arkansas Department of Pollution Control and Ecology Commission (PC&E), the appellee. That order required forfeiture of a letter of credit issued by Banco Portugues Do Atlantico (Banco), the appellant. We conclude it was error to permit the forfeiture, and thus we reverse.

PC&E issued a surface or strip mining permit to Sugarloaf Mining Company (Sugarloaf) on October 9, 1981. The permit, # P-272-M-CO, was bonded by American Casualty Company, which later became National Fire Insurance Company (National Fire), in the amount of $657,250. The bond had an expiration date of October 9, 1986.

The testimony of Arthur Ritchie, Engineer Supervisor for PC&E's Mining Division, established that this permit limited Sugarloaf to reclamation work only within a confined work area. The reclamation requirement amounted to bringing the area to approximate original contour, replacing topsoil, and replacing vegetation. The amount of the bond was calculated to cover the cost of reclamation of the area and was tied to the specific conditions set out in the permit. The resulting figure represents the cost of reclamation in an existing 4000 feet of pit with an area of 118 acres. The specifications called for the preparation and loading area of 59 acres at $1500 per acre, and the permit would not allow Sugarloaf to work beyond that point until an adjust-

ment was made in the bond.

Prior to the expiration of the permit, Sugarloaf was notified that an increase in bond was required. National Fire's bond was then augmented with a letter of credit issued by Banco on June 9, 1986, in the amount of $375,385.75. The letter of credit stated that it covered permit # P-272-M-CO and that it was payable upon demand by PC&E upon the satisfaction of certain conditions, including presentation of a draft accompanied by a notice of forfeiture issued by PC&E and a statement that the bond covering the permit had been fully depleted for reclamation.

Contemporaneously with the issuance of the letter of credit Sugarloaf and PC&E were negotiating to begin mining operations over a larger project area. The negotiations resulted in the issuance of another permit which PC&E described as # P-272-M-CO (Renewal) which substantially altered the terms of the agreement between Sugarloaf and the PC&E. The application for a renewal was received by PC&E prior to the expiration of the first permit, but because the application was unacceptable, it was not signed by Sugarloaf until July 31, 1986, and finally approved by PC&E until August 7, 1987. In the conditions to the permit Ritchie added "as of May 6, 1986, the reclamation bond requirements for the permit are $1,032,635.75" or the combined total of the National Fire bond and Banco's letter of credit.

The new permit added sections not contained in the earlier permit, permitted mining operations, and added tasks to be performed by Sugarloaf, including backfill and grading of 1,335,335 cubic yards (almost triple the requirement of the first permit); reclamation of 1.25 acres for each acre of land disturbed; bulldozer work, and the fencing of a high wall.

Sugarloaf began mining operations sometime in 1986 but ceased operation altogether in May of 1987. Ritchie testified that Sugarloaf mined for about one month, producing about 44,000 tons of coal and did only a little reclamation work on the project while opening up new areas which had to be reclaimed. Ritchie also testified that reclamation costs at all times after January 1986 exceeded the combined $1.03 million value of the bond and the letter of credit, and he concluded that the ultimate cost of reclamation would be in excess of $2 million.

A notice of bond forfeiture was issued by PC&E on March 14, 1990. The specific violations in the notice were all of requirements spelled out in the renewal permit which was executed August 1, 1987. Banco requested an adjudicatory hearing which was held October 5, 1990, before a hearing officer who issued a decision recommending approval of the forfeiture. Banco appealed the recommendation to the Commission, and by Minute Order of January 25, 1991, the recommendation was adopted. Banco appealed to the Circuit Court, and the order was affirmed.

Banco appeals arguing the Court erred as there is no evidence to support the decision. They also assert that the decision is arbitrary, capricious, and characterized by an abuse of discretion because, (1) the obligation the letter of credit was given to secure was materially altered to their detriment, (2) the letter of credit is not subject to forfeiture because the conditions precedent have not been satisfied, and (3) PC&E failed to disclose material facts concerning Banco's potential liability and is therefore estopped from forfeiting the letter of credit.

## 1. Standard of review

Review of administrative decisions, both in the Circuit Court and here, is limited in scope. Such decisions will be upheld if they are supported by substantial evidence and are not arbitrary, capricious, or characterized by an abuse of discretion. *Arkansas Alcoholic Beverage Control Board v. King*, 275 Ark. 308, 629 S.W.2d 288 (1982); *Arkansas Real Estate Commission v. Harrison*, 266 Ark. 339, 585 S.W.2d 34 (1979). Administrative action may be regarded as arbitrary and capricious only when it is not supportable on any rational basis. *Partlow v. Arkansas State Police Commissioner*, 271 Ark. 351, 609 S.W.2d 23 (1980). It has been said that the appellate court's review is directed, not toward the circuit court, but toward the decision of the agency. That is so because administrative agencies are better equipped by specialization, insight through experience, and more flexible procedures than courts, to determine and analyze legal issues affecting their agencies. *First National Bank v. Arkansas State Bank Commissioner*, 301 Ark. 1, 781 S.W.2d 744 (1989). Finally, the interpretation of statutes by an administrative agency, while not conclusive, is highly persuasive. *Arkansas*

*Contractor's Licensing Board* v. *Butler Construction Co.*, 295 Ark. 223, 7 S.W.2d 129 (1988).

The standard has its origin in the Administrative Procedure Act and our case law which requires that appellate review under the act be "narrowly prescribed," *Arkansas Poultry Commission* v. *House*, 276 Ark. 326, 634 S.W.2d 388 (1982), with "a role of limited scope" *City of Newport* v. *Emery, et al*, 262 Ark. 591, 559 S.W.2d 707 (1977). This narrow scope does not, however, permit this Court to allow an agency to disregard the law because the A.P.A. provides:

25-15-212. Administrative adjudication - Judicial review.

\* \* \*

(g) The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony may be taken before the court. The court shall, upon request, hear oral argument and receive written briefs.

(h) The court may affirm the decision of the agency or remand the case for further proceedings. It may reverse or modify the decision if the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the agency's statutory authority;

(3) Made upon unlawful procedure;

(4) *Affected by other error or law;*

(5) Not supported by substantial evidence of record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion.

[emphasis added]

In *Woodyard* v. *Ark. Diversified Ins.*, 268 Ark. 94, 594 S.W.2d 13 (1980), we explained the standard with respect to

legal issues as follows:

> The requirement that administrative action not be arbitrary or capricious is less demanding than the requirement that it be supported by substantial evidence. To be invalid, under the former standard, the action must lack rational basis, *First Nat. Bank of Fayetteville* v. *Smith*, 508 F.2d 1371 (8th Cir. 1974) cert. den. 421 U.S. 930, or hinge on a finding of fact based on an erroneous view of the law. *Williams* v. *Celebrezze*, 243 F. Supp. 103 (W.D. Ark. 1965). Action is not arbitrary simply because the reviewing court would act differently. *Harding Glass Co.* v. *Ark. Public Service Comm.*, 229 Ark. 153, 313 S.W.2d 812 (1958).

■ In this case we are confronted with an erroneous view of law which affects the decision of the agency. The hearing officer found the renewal permit constituted a material alteration of the original permit. We agree that the changes constituted a material alteration of the contract obligation between Sugarloaf and the PC&E. The officer also concluded that the conditions of the renewal permit were accepted by Sugarloaf on June 9, 1986, because the application for renewal was signed by Sugarloaf's attorney on that date. It was the same day that the letter of credit was issued by Banco. From this, the hearing officer concluded that Banco also accepted the conditions of the renewal permit. This conclusion is factually defective because the testimony establishes that the renewal permit, containing the new conditions, was not executed until more than a year later. This finding also reveals that the hearing officer was treating the letter of credit as a surety bond which incorporated the conditions of the underlying contract, the renewal permit, by acquiescence. This is contrary to both the law of letters of credit and the provisions of the Uniform Commercial Code which govern these documents.

## *2. The law of letters of credit*

■ The letter of credit and the surety contract are both commercial devices, and they share a common purpose. Both insure against the obligor's nonperformance. They function, however, in distinctly different ways. The letter of credit is somewhat akin to a performance bond in that:

> In place of a performance bond from a true surety, . . . (customer) gets his bank (issuer) to write . . . (beneficiary) a standby letter of credit. In this letter, issuer engages to pay beneficiary-owner against presentment of two documents: 1) a written demand (typically a sight draft) which calls for payment of the letter's stipulated amount, plus 2) a written statement certifying that customer-builder has failed to perform the agreed construction work.

Another difference between the standby letter of credit and the surety contract is that the standby credit beneficiary has different expectations.

> In the surety contract situation, there is no duty to indemnify the beneficiary until the beneficiary establishes the fact of the obligor's nonperformance. The beneficiary may have to establish that fact in litigation. During the litigation, the surety holds the money and the beneficiary bears most of the cost of delay in performance.

> In the standby credit case, however, the beneficiary avoids that litigation burden and receives his money promptly upon presentation of the required documents. It may be that the account party has in fact performed and that the beneficiary's presentation of those documents is not rightful. In that case, the account party may sue the beneficiary in tort, in contract, or in breach of warranty; but during the litigation to determine whether the account party has in fact breached his obligation to perform, the beneficiary, not the account party, holds the money.

J. Dolan, *The Law of Letters of Credit*, ¶ 1.05[1] at 1-18, 1-19 (2d ed. 1991). *See also, Rose Developments, Inc.* v. *Pearson Properties*, 38 Ark. App. 215, 832 S.W.2d 286 (1992).

Because the obligations and expectations of the issuer and the beneficiary differ from the traditional surety situation it follows that once an irrevocable letter of credit is established, the credit engagement may not be altered in any way without the consent of the parties. Dolan, *supra*, ¶ 5.02[1] at 5-12. *LeaseAmerica Corp.* v. *Norwest Bank Duluth, N.A.*, 940 F.2d 345 (8th Cir. 1991).

■ Banco's letter of credit stated on its face that it was issued pursuant to The Uniform Customs and Practice for Documentary Credits (UCP), a body of rules established more than 60 years ago and adopted by credit issuers throughout the world in 1963. Article 10(d) of the UCP (1983 version) provides:

> Such undertakings can be neither amended nor cancelled without the agreement of the issuing bank, the confirming bank (if any) and the beneficiary. Partial acceptance of amendments contained in one and the same advice of amendments is not effective without the agreement of all the above-named parties.

Clearly the agreement between the account party (Sugarloaf) and the beneficiary (PC&E) cannot alter the terms of the credit, which specified coverage of the original permit, without the consent of the issuer. Equally clearly, Banco may not be held to have consented, by its agreement to the terms of an existing permit, to changes which had not occurred and would not occur until execution of a different permit on a later date.

### 3. The Uniform Commercial Code

Letters of credit are also governed by the Uniform Commercial Code - Letters of Credit, Ark. Code Ann. §§ 4-5-101 through 117 (Repl. 1991). Section 4-5-114(1) provides that an issuer must honor a draft which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary. However, the issuer does not have an absolute duty to honor a draft authorized by the letter of credit. An exception is provided by 4-5-114(2) which provides that an issuer need not honor the draft if "a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (4-8-306) or of a certificated security (4-8-306) or is forged or fraudulent or there is fraud in the transaction." Section 4-5-106(2) specifies two of the parties, the account party and the beneficiary, must consent to any modification, and § 4-5-104 requires not just that the credit be a signed writing but that the confirmation and amendments be signed by the issuer as well.

■ In the absence of Banco's signature approving the renewal permit and authorizing coverage of the obligations it

established, no forfeiture may occur based on Sugarloaf's failure to meet those obligations.

### 4. Conclusion

██ Only PC&E offered testimony in the case presented to the hearing officer, and all of it concerned violations of the renewal permit. Banco's letter of credit does not apply to the renewal permit, and the order of forfeiture must be reversed. However, that testimony also established that the cost of reclamation from January 1986 exceeded the bonding provided by National Fire which suggests that some portion if not all the sum guaranteed by the letter of credit may be required to reclaim the area specified in the original permit. We remand this case to the Circuit Court for further remand to the Commission to permit the parties to present evidence concerning the cost of reclamation under the original permit.

Reversed and remanded.

HAYS and BROWN, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. Sugarloaf agreed to the new conditions for Permit No. 272-M-CO on June 9, 1986, by the signature of its attorney, Sam Sexton, Jr. A vice president of Sugarloaf then signed the same document six months later. Also on June 9, 1986, BPA established its irrevocable letter of credit covering Permit No. 272-M-CO, effective that same date. The hearing officer found:

> It is reasonable to conclude that the Renewal Permit and BPA's letter of credit were basically simultaneous acts. The only reason it was necessary to obtain BPA's letter of credit was because the Renewal Permit required it. It is unreasonable to believe that BPA was not aware of the Renewal Permit.

The Pollution Control & Ecology Commission adopted the recommendation of the hearing officer to forfeit the bond. The circuit court found that the Commission's decision was supported by substantial evidence. The finding of the hearing officer, albeit based on circumstantial evidence, makes good common sense to

me. I would affirm.

HAYS, J., joins.

## SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
## DECEMBER 14, 1992

*Harper, Young, Smith and Maurras*, by: *S. Walton Maurras*, for appellant.

*Steve Weaver, William Eckert, III*, and *Chisenhall, Nestrud & Julian, P.A.*, by: *Ann P. Faitz*, for appellee.

DAVID NEWBERN, Justice. In part 1. of our opinion in this case, entitled *Standard of review*, we erred in our discussion by failing to cite Ark. Code Ann. § 15-58-212(i) (1987) which sets out the standard to be used by a circuit court reviewing a decision reached in an administrative proceeding before the Arkansas Pollution Control and Ecology Commission. We adhere, however, to our statement that the limited review of administrative agency decisions, generally, has its origins in the Administrative Procedure Act.

The reader should know that, although we found a factual error, as described in our original opinion, the main burden of the opinion is to point out that the hearing officer's decision misperceived the law of letters of credit by finding that an account party and a beneficiary may bind the issuer of a letter of credit where there is no evidence that the issuer assumed any additional obligation.

Rehearing denied.

HAYS and BROWN, JJ., would grant PC&E's motion for rehearing.