ARKANSAS DEPARTMENT OF HUMAN SERVICES *v.*
Beverly SCHRODER

02-998                                    122 S.W.3d 10

Supreme Court of Arkansas
Opinion delivered July 3, 2003

886

*Breck G. Hopkins*, for appellant.

*Raymon B. Harvey, P.A.*, for appellee.

RAY THORNTON, Justice. Appellant, Arkansas Department of Human Services ("DHS"), appeals an order entered by the Pulaski County Circuit Court reversing an administrative determination made under the Arkansas Administrative Procedure Act that denied Medicaid benefits to appellee, Beverly Schroder. On appeal, DHS argues that a single-premium annuity purchased for $90,000.00 should be categorized as a countable asset, and that appellee was ineligible for Medicaid benefits. We reverse the decision of the trial court to the effect that Mrs. Schro-

der was eligible for Medicaid benefits, and we remand the matter to the administrative law judge ("ALJ") for further findings.

On September 24, 1999, appellee entered a long-term care facility. Appellee's husband, John Schroder, remained in the marital home. Before Mrs. Schroder was admitted to the nursing home, she applied for and was determined to be eligible for Medicaid benefits. At the time Mrs. Schroder entered the nursing home, the Schroders had countable assets of $184,788.68, including checking accounts, certificates of deposit, life insurance policies, and other resources. Under Medicaid eligibility rules, countable assets do not include the family home, one automobile, and other excludable property.

Ms. Schroder submitted a Medicaid application, which was initially accepted. However, a DHS caseworker evaluated the Schroders' assets and determined that Mrs. Schroder was ineligible for Medicaid. Mrs. Schroder's case was closed in December of 2000, and she did not appeal the caseworker's decision.

On November 18, 1999, just before Mrs. Schroder's first application was rejected, Mr. Schroder purchased an annuity from Hartford Life Insurance Companies ("Hartford") for a single premium of $90,000.00, with monthly payments of $1,651.50 to be distributed to Mr. Schroder for a fixed period of five years. According to the Office of Chief Counsel at DHS, the funds used to purchase the annuity came from appellee's spousal share. At the time of the purchase, Mr. Schroder was eighty-four years of age with a life expectancy of 5.59 years, according to Medicaid life expectancy tables.

The annuity lists Mr. Schroder as the annuitant, and Mr. Schroder's sons, John C. Schroder and David A. Schroder, are listed the beneficiaries in the event of Mr. Schroder's death prior to the end of the designated period of five years. Upon Mr. Schroder's death, the annuity payments would be continued to the beneficiaries. The annuity states, "You may assign this contract. Until you notify us in writing, no assignment will be effective against us. We are not responsible for the validity of any assignment." It further states, "This contract is intended to qualify as an annuity contract for federal income tax purposes." The annuity

also provides that "[t]o change the owner or beneficiary, notify us in writing." In a letter from Cara C. Dougherty, an employee with Hartford, she states, "This policy does not allow for a change of annuitant, however, it does allow for a change of ownership."

On April 3, 2001, Mrs. Schroder filed a second Medicaid application. After receiving a second legal opinion from the Office of Chief Counsel on the matter, the caseworker denied the second application in May 2001. The Schroders appealed, and an ALJ affirmed the caseworker's decision. On October 26, 2001, a final order was entered in which the ALJ ruled that (1) an annuity purchased by Mr. Schroder had a value of $70,000.00 and could be sold and converted to cash, (2) the purchase of the annuity was not made for the "sole benefit" of Mr. Schroder, and (3) the purchase of the annuity was made for the purpose of qualifying for Medicaid benefits.

The Schroders filed a petition for judicial review in Pulaski County Circuit Court, pursuant to the Arkansas Administrative Procedures Act, codified at Ark. Code Ann. § 25-15-212 (Repl. 1996), seeking review of the ALJ's decision to deny Medicaid benefits to appellee. A hearing was held on July 25, 2001. After the hearing, the trial court reversed the decision of the ALJ, finding that the annuity was actuarially sound and that DHS acted arbitrarily in not considering this point. It is from the trial court's order that DHS brings its appeal.

■ ■ Our standard of review was articulated in *Wright v. Arkansas State Plant Board*, 311 Ark. 125, 842 S.W.2d 42 (1992), where we stated:

> [W]hen reviewing administrative decisions, we review the entire record to determine whether there is any substantial evidence to support the administrative agency's decision, whether there is arbitrary and capricious action, or whether the action is characterized by abuse of discretion. *In re Sugarloaf Mining Co.*, 310 Ark. 772, 840 S.W.2d 172 (1992); *Singleton v. Smith*, 289 Ark. 577, 715 S.W.2d 437 (1986); *Green v. Carder*, 282 Ark. 239, 667 S.W.2d 660 (1984); *Arkansas Alcoholic Beverage Control Bd. v. King*, 275 Ark. 308, 629 S.W.2d 288 (1982). We have recognized that administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible pro-

cedures to determine and analyze underlying legal issues affecting their agencies, and this recognition accounts for the limited scope of judicial review of administrative action and the refusal of the court to substitute its judgment and discretion for that of the administrative agency. *First Nat'l Bank v. Arkansas State Bank Comm'r*, 301 Ark. 1, 5, 781 S.W.2d 744, 746 (1989); *Arkansas State Hwy. Comm'n v. White Advertising Int'l*, 273 Ark. 364, 620 S.W.2d 280 (1981); *Arkansas Beverage Control Bd. v. King, supra*; *Gordon v. Cummings*, 262 Ark. 737, 561 S.W.2d 285 (1978).

To determine whether a decision is supported by substantial evidence, we review the whole record to ascertain if it is supported by relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Livingston v. Arkansas State Medical Bd.*, 288 Ark. 1, 701 S.W.2d 361 (1986); *Partlow v. Arkansas State Police Comm'n*, 271 Ark. 351, 609 S.W.2d. 23 (1980). To establish an absence of substantial evidence to support the decision, the appellant must demonstrate that the proof before the administrative tribunal was so nearly undisputed that fair-minded persons could not reach its conclusions. *Beverly Enters.-Ark., Inc. v. Arkansas Health Servs.*, 308 Ark. 221, 824 S.W.2d 363 (1992); *Williams v. Scott*, 278 Ark. 453, 647 S.W.2d 115 (1983). Substantial evidence is valid, legal and persuasive evidence. *Independence Sav. & Loan Ass'n v. Citizens Fed. Sav. & Loan Ass'n*, 265 Ark. 203, 577 S.W.2d 390 (1979).

*Wright, supra.*

For its sole point on appeal, DHS argues that the trial court erred in reversing the ALJ's decision to deny Medicaid benefits to Mrs. Schroder based upon an annuity purchased by her husband. Specifically, DHS contends that a single-premium $90,000.00 annuity should be considered as a countable asset for purposes of determining Mrs. Schroder's eligibility for Medicaid nursing home benefits. However, DHS made the additional point in proceedings before the ALJ that Mrs. Schroder was ineligible regardless of whether the annuity was considered.

■ An overview of the Medicaid program is appropriate. The Medicaid Act was established by Title XIX of the Social Security Act of 1965, codified at 42 U.S.C. § 1396 *et seq.* (1994). In *Ramsey v. Department of Human Services*, 301 Ark. 285, 783

S.W.2d 361 (1990), we provided a historical background of the Medicaid Program:

> The Congress, in 1965, established the Medicaid program, which is a medical assistance program for people "whose income and resources are insufficient to meet the costs of necessary care and services" 42 U.S.C. § 1396-1396k (Supp. II 1982); *Atkins v. Rivera*, 477 U.S. 154, 156, 106 S. Ct. 2456, 2458, 91 L. Ed. 2d 131 (1986). Medicaid benefits are provided automatically for the "categorically needy," persons who receive welfare payments under the Aid for Dependent Children (AFDC) and Supplemental Security Income (SSI) programs. If a state participates in the Medicaid program, it must provide coverage for the "categorically needy." 42 U.S.C. § 1396a(a)(10)(A) (Supp. II 1982).
>
> Congress also enacted an optional program for the "working poor" who were deemed "medically needy." The "medically needy" become eligible for medicaid benefits when their income and assets are reduced by incurred medical expenses that reduce their income and assets below certain established levels. [These circumstances] then put them in roughly the same position as the "categorically needy." Public Health, 42 C.F.R. §§ 435.301, 435.308 (1987); 42 U.S.C. § 1396a(a)(17) (Supp. II 1982). Arkansas has elected to include this optional plan under its State Medicaid Plan. Therefore, it must comply with the requirements imposed by the federal Medicaid statutes. *Atkins v. Rivera, supra;* 42 U.S.C. § 1396a, *supra.*

*Ramsey, supra.*

Arkansas is a participating state in the Medicaid program. While the Secretary of the United States Department of Health and Human Services, through the Health Care Financing Administration ("HCFA") administers Medicaid on the federal level,[1] the Arkansas Department of Human Services and its county offices administer the program on the local level. HCFA has promulgated its standards in the State Medicaid Manual.

Prior to 1988, a married individual who was admitted to a nursing home or other facility ("institutionalized spouse") was

---

[1] On June 14, 2001, the HCFA was renamed the Center for Medicare and Medicaid Services ("CMS"). Because this cause of action took place before the HCFA was renamed, we will refer to the agency as HCFA.

required to "spend down" his or her assets jointly held with the spouse who remained in the home ("community spouse") to become eligible for Medicaid benefits. H.R. Rep. No. 100-105(II), 100th Congr., 2nd Sess., at 65-67 (1988), reprinted in 1988 U.S.C.C.A.N. 857, 888-90. However, in 1988, Congress enacted the Medicare Catastrophe Coverage Act ("MCCA") of 1988, 42 U.S.C. § 1396r-5 and the Omnibus Budget Reconciliation Act ("OBRA"), 42 U.S.C. § 1396p.[2] MCCA was designed "to protect the elderly and disabled population from the financial disaster caused by catastrophic health care expenditures not currently reimbursed under the Medicare and Medicaid programs." H.R. Rep. No. 100-105, pt. 2, at 65-68 (1998), reprinted in 1988 U.S.C.C.A.N. 803, 888. MCCA also "sought to close the loophole where a couple could shelter their assets by transferring them into the community spouse's name while the institutionalized spouse received Medicaid benefits." *Johnson v. Guhl*, 166 F. Supp. 2d 42 (D.N.J. 2001).

When determining the institutionalized spouse's Medicaid eligibility, a computation of the couple's total joint resources is taken "as of the beginning of the first continuous period of institutionalization." 42 U.S.C. § 1396r-5(c)(1)(A). The couple's resources are divided into countable and exempt assets, and one-half of the total value of the resources "to the extent either the institutionalized spouse or the community spouse has an ownership interest" is considered a spousal share. *Id.*

In order to prevent the community spouse from "spending down," the community spouse is allowed a "community spouse resource allowance" ("CSRA") of the couple's countable assets. 42 U.S.C. § 1396r-5(f). The maximum amount of the CSRA is one-half of the couple's combined countable resources, not to exceed an amount that Congress adjusts annually. 42 U.S.C. § 1396r-5(c), (f). As of September 24, 1999, the maximum community spouse resource allowance was $81,960.00. Spousal Impoverishment Resource Sheet, App. to Op. Br. at A-40

---

[2] Congress later repealed MCCA through the Medicare Catastrophic Coverage Repeal Act of 1989 (Pub. L. No. 101-234, 103 Stat. 1979), but the spousal impoverishment prevention provisions were retained.

through A-43. Any countable assets left over are then attributed to the institutionalized spouse as his or her spousal share. 42 U.S.C. § 1396-r. If those countable assets attributed to the institutionalized spouse are equal to or less than $2,000.00, then the institutionalized spouse is eligible for Medicaid nursing home benefits. *Id.; see also* Medical Services Policy 3330.1 (stating that the countable resource limitation for eligibility is $2,000.00 for an individual).

We are asked to consider whether the $90,000.00 annuity purchased for the community spouse should be categorized as a countable asset for the purpose of determining Medicaid eligibility of the institutionalized spouse. Before considering this issue, we note that DHS concludes that the issue of whether the annuity purchased by Mr. Schroder is countable is irrelevant to his wife's eligibility status because her financial resources still exceeded the amount that would disqualify her after the purchase of the annuity. If this conclusion that Mrs. Schroder is ineligible for Medicaid benefits, regardless of whether the annuity is countable, is correct, then the issue of eligibility would be resolved, and any determination whether the annuity is a countable asset would be an advisory opinion.

This point was addressed briefly at the administrative hearing by Ann West, attorney for DHS, and Sally Hall, a Medicaid caseworker for DHS. At the hearing, Ms. Hall testified that she determined appellee was ineligible for Medicaid benefits based upon Form 710, a Long-Term Care ("LTC") Spousal Resources Assessment Sheet that DHS uses to determine the spousal share of the couple's countable financial resources. Form 710 was signed by Ms. Hall and dated on December 1, 2000.

The following colloquy took place:

> WEST: I'll have a few questions for you. We discussed this case in preparation for the hearing and could you please tell the judge why, in addition to the annuity, you denied the benefit? Was there something here about being over the resource limit not even counting the annuity?
>
> HALL: Okay. It was the opinion that the Office of Chief Counsel . . . that the annuity must be counted as a resource.

* * *

WEST: All right. If the annuity was not even involved, if we don't even consider the annuity, were they over their resources?

HALL: Based on just liquid assets?

WEST: Uh huh.

HALL: Okay. Let me look at this form here to answer your question. What I'm looking at is Form 710—

WEST: Okay. Uh huh.

HALL: That I completed.

WEST: It might be December the 1st. Is that the date of this?

HALL: Yeah. When you, when you look at the, the, yeah, it's dated December 1st of 2000. Correct.

WEST: Uh huh.

HALL: Umm, yes, they would still have been over resources because the annuity was for, um, I'm trying to think how much the annuity was for. It was for, like $89,000.

WEST: Uh huh.

HALL: $90,000. And their total assets, including the annuity was [$184,000]. So, they still would have been, had excess resources *that would have had to be spent down.*

WEST: *Even if we did not count the annuity?*

HALL: *Even if you did not count the annuity.*

(Emphasis added.)

However, it appears from our review of the record that the denial of appellee's April 1, 2001 application was based upon the December 1, 2000 eligibility worksheet. This is revealed in the following colloquy:

RICHART: Okay. When—, you said the application was April 1st?

HALL: April 3rd of 2001 was the application that I had after he, after they were closed due to the annuity.

RICHART: Okay. All right. And you understand we're not doing anything related to the closure? I don't believe that was appealed or not in this appeal anyways.

HALL: Right. It's based on this, from what I understand, it's based on the denial of the April 3, 2001, application.

RICHART: All right. So, if he had not converted the home by April 3rd, are you, is it my understanding that you're stating that would be a resource then because he had not converted it to a new home?

HALL: Um, yes, it should be counted in the Resource Assessment.

RICHART: Okay. And was it?

HALL: I'm double checking myself here. I don't know that I updated the Resource Assessment because there was still—, he was still excess resources because of the annuity.

RICHART: Okay. Well, do we have a—, I get my forms mixed up, the set, the ones that state what the resources are at the time, in the month of the application what were the resources?

HALL: The one that I have is dated December of 2000. That was when I discovered the problem with the annuity.

RICHART: Okay. So, there was none for this April application that's on appeal?

HALL: No, because we still had problems with the annuity, regardless.

RICHART: Okay. And what's the other form? Is it a 713?[3]

HALL: 713 is the, about the spousal with the Resource Assessment.

RICHART: Okay. So, for this application, we don't have either of those forms, right?

HALL: No, ma'am. We based it [the April 1, 2001, application] on the December 2000 figures because of the annuity. Regardless of how much they got out of the home, they were still ineligible because of the annuity.

\* \* \*

RICHART: Okay. As far as you can tell, you have everything then as far as what the resources were April 1st?

HALL: I believe so, but that—, we based it on the month they entered the nursing home, because she was continuously institutionalized.

---

[3] Form 713 to which Ms. Richart refers is a separate LTC spousal resource eligibility worksheet where the institutionalized spouse's spousal resource allowance computation, as well as the institutionalized spouse's eligibility, are reflected.

RICHART: Right. But, you would have to compare that to the resources they presently have at the say of the appli—, or the month of the, the beginning of the month of the application?

HALL: Correct. To see if anything had been spent.

RICHART: Right.

HALL: Yes. I do have that. I don't have those things calculated though.

At this point in the hearing, Ms. Hall, Ms. Richart, and Mr. Harvey, attorney for appellee, appeared to determine what the Schroders' financial snapshot was for April of 2001. This following colloquy took place:

RICHART: Okay. I guess we can wait and—, well, let's wait and see. Do you want that calculated, Ms. West?

WEST: Could she do that fairly quickly? I mean, that might be helpful for us to know that.

RICHART: Okay. Do you think that's something you can do fairly quickly?

HALL: Uh, just on the calculator real quick.

RICHART: Okay.

HALL: Okay. Let me do a real quick calculation then.

RICHART: Okay. I'll take us off the record while you're doing that.

HALL: Okay.

RICHART: All right. We're back on the record.

HALL: Okay.

HARVEY: I'm concerned she'll be rushed.

RICHART: I understand. I understand.

HARVEY: And you may or may not have everything there.

RICHART: Right, we don't right.

HARVEY: Right, we don't, right.

HARVEY: Yeah, there's complication—

RICHART: All right.

HARVEY: Basically, the issue comes down to the annuity. So—

RICHART: Of course, then I'd have to remand it back for all this. If I ruled in favor of that, it would still have to be remanded

for all the information on the resource at the beginning of the month.

■ ■ Based upon these colloquies from the hearing, it appears that DHS intended to supplement the Form 710 eligibility worksheet, dated December 1, 2000, with the April bank statements from Mr. Schroder in order to provide the basis on which to deny appellee's Medicaid application. However, this practice does not comply with federal law. Under 42 U.S.C. § 1396r-5(c)(1)(A), a computation of the couple's total joint resources is taken "as of the beginning of the first continuous period of institutionalization." *Id.* This is done by "determining the resources of an institutionalized spouse *at the time of application for benefits* . . . [.]" 42 U.S.C. § 1396r-5(c)(1)(B)(2) (emphasis added). Here, a new spousal eligibility worksheet should have been completed by DHS in April 2001, the month that appellee submitted her second application for Medicaid benefits. DHS's supplementing the December 1, 2000 eligibility worksheet with Mr. Schroder's April bank statements does not present a full picture of the Schroders' financial status at the time that appellee applied for Medicaid a second time in April of 2001. Their financial circumstances could have changed substantially during that four-month interim.

■ Because DHS did not complete the eligibility worksheet in April of 2001, we must reverse and remand the matter to the ALJ for these findings. Until the ALJ determines the threshold issue of whether Mrs. Schroder is eligible for Medicaid benefits, even if the annuity is excluded as a countable asset, we cannot reach the issue whether the annuity is countable for purposes of eligibility, and we will not render an advisory opinion on this question in the present appeal.

Reversed and remanded.

GLAZE AND HANNAH, JJ., dissent.

CORBIN, J., not participating.

TOM GLAZE, Justice, dissenting. Returning this case to the Administrative Law Judge to complete an eligibility worksheet is a waste of time for everyone, including Mrs. Betty Schroder. As the majority states, DHS's position is that the

$90,000 annuity should be considered a countable asset when determining Mrs. Schroder's eligibility for Medicaid nursing home benefits. In the proceeding before the ALJ, DHS also submitted that, because of other financial resources, she would still be ineligible even without counting the $90,000 annuity.

When this case was tried before the ALJ and the circuit court, *both* parties agreed that the sole issue was whether DHS properly denied benefits to Mrs. Schroder based upon the $90,000 annuity. In fact, the indisputable fact is that, if the annuity in issue *is* a countable asset, as the ALJ determined, Mrs. Schroder must be found ineligible for Medicaid benefits. If the circuit court was correct in deciding the annuity *is not* countable, then Mrs. Schroder is eligible for benefits. Either way, this case would be concluded on the facts and law presented and argued by the parties. If there were other arguments to be made when this matter was tried, then the parties should have raised, argued, and preserved those points at trial so they could be considered on appeal.

The majority court's suggestion that any ruling on the $90,000 annuity issue would be advisory is plainly wrong. The only point raised and argued below and argued on appeal has been the annuity asset issue. This court should decide that issue and lay this matter to rest. Doing otherwise only delays the parties from obtaining a final decision to which they are entitled. It is not this court's responsibility to tell parties how they should try their lawsuit. We should decide this case now. For the reasons above, I dissent.

HANNAH, J., joins this dissent.

JIM HANNAH, Justice, dissenting. I respectfully dissent from the majority's conclusion that this case must be remanded for a determination regarding the Schroders' financial resources before the issue of whether the annuity is a countable asset can be determined. This case was certified to us on several grounds, most notably that the annuity issue is one of first impression. The majority has chosen, however, to completely sidestep the only issue that is properly before us on appeal.

The hearing officer's decision in the present matter is based solely on the determination that the annuity is a countable asset.

The majority attempts to dodge the fact that the hearing officer never addressed the issue of other available assets by stating that the issue was briefly raised during the administrative hearing. While this is true, a closer review of the record reveals that the issue of other available assets was cut short, and the hearing itself limited to the sole issue of the annuity's status.

From the outset of this case, DHS has taken the position that Mrs. Schroder was ineligible for Medicaid benefits because the annuity purchased by her husband was a countable asset. In their May 3, 2001, Notice of Action, DHS stated that Mrs. Schroder's application was being denied because the annuity had to be counted as a resource. No mention was made regarding other assets. As the majority points out, Sally Hall, Family Support Specialist for DHS, testified at the administrative hearing that she was responsible for reviewing Mrs. Schroder's Medicaid application and determined that she was ineligible for benefits. According to Hall, a review of the Schroders' Resource Assessment forms from December 1, 2000, indicated that the Schroders had liquid assets in excess of the allowable maximum that would have to be spent down before they could become Medicaid eligible. According to Hall, this excess did not include the annuity. The hearing officer pointed out, however, that the present appeal was from the denial of the April 3, 2001, application and not the denial of the December 1, 2000, application. Hall then stated she was unsure as to whether or not she had updated the Resource Assessment, because there was no reason to update the forms given the fact that Mrs. Schroder still had excess resources due to the annuity. Hall ultimately admitted that she did not have updated Resource Assessment forms for the April 3, 2001, application; rather, she based her determination on the December 2000 figures, because of the fact that the annuity was considered a countable resource.

Upon further questioning, Hall stated that she did have an updated bank statement for the Schroders, but that she had not done any calculations comparing the 2001 information with the 2000 information to determine if any resources had been spent in that time. The hearing officer then asked DHS's counsel, Ann West, if she would like Hall to calculate that information. Initially, West stated that the information might be helpful. Then,

Raymon Harvey, counsel for Mrs. Schroder, stated that he was concerned that Hall might be rushed in doing the calculations and may not have all the information that she needed to complete them. The following colloquy then took place between the hearing officer and both attorneys:

HARVEY: Basically, the issue comes down to the annuity. So —

[HEARING OFFICER]: Of course, then I'd have to remand it back for all this. If I ruled in favor of that, it would still have to be remanded for all the information on the resource at the beginning of the month.

HARVEY: But, if it makes a difference on whether there's —, if the annuity is indeed counted as an available resource, the amount of excess, we need to know. My client needs to know.

[HEARING OFFICER]: Right, right.

HARVEY: And if there are other resources beyond the annuity itself that are still in excess, we need to know that too.

[HEARING OFFICER]: Right.

HARVEY: I mean, it makes a big difference when, where we have $100,000 too much or we have $10,000 too much.

[HEARING OFFICER]: Right, right, right.

HARVEY: And whether the house is involved.

[HEARING OFFICER]: So you want to hold off on that, figuring? I mean, I'm sure they can give it to you other than through this hearing.

HARVEY: Yeah, just hold off on the —

[HEARING OFFICER]: Is that all right with you, Ms. West?

WEST: That's fine.

[HEARING OFFICER]: So the attorneys both kind of seem to be agreeing that they want to hold off on that determination and only discuss the annuity.

HALL: Okay. So, you don't need a figure then, right?

[HEARING OFFICER]: Right. I mean, Mr. Harvey, if the annuities would be ruled in his favor, he'd still need to know if they were over resources so they'd know how much, you know, what they'd need to reduce by to make her eligible. All right. So,

we'll carry on and we'll narrow this just to the issue of the annuity then.

Clearly, the only issue considered and decided by the hearing officer was the issue of whether or not the annuity was a countable asset. The fact that the administrative hearing was limited to only this issue was agreed to by DHS's counsel. DHS cannot now argue, nor can the majority properly conclude, that the issue regrading the annuity is immaterial because of other excess assets. We have repeatedly stated that failure to obtain a ruling from the trial court is a procedural bar to the consideration of an issue on appeal. *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001); *Estate of Donley v. Pace Indus.*, 336 Ark. 101, 984 S.W.2d 421 (1999).

Despite the fact that the issue is not properly before this court, the majority now opines that the proper method for handling this case is to remand it for a determination of the Schroders' resources in April of 2001. Not only is the majority ignoring the only issue in this appeal, but it is also creating a new argument for DHS. It is axiomatic that this court will not make a party's argument for him, nor raise an issue *sua sponte* unless it involves the jurisdiction of this court to hear the case. *See Ilo v. State*, 350 Ark. 138, 85 S.W.3d 542 (2002); *R.N. v. J.M.*, 347 Ark. 203, 61 S.W.3d 149 (2001). The majority, without any citation to controlling authority, deems this a "threshold matter" that must be determined before the issue of the annuity's status as a countable asset is addressed. The majority ignores, however, the critical fact that in order for DHS to completely and correctly make a determination regarding the Schroders' resources, the agency needs to know whether the annuity is a countable asset.

In her opinion, the hearing officer stated in the finding of facts as follows:

> 2.    Mrs. Schroder applied again for Medicaid benefits in May of 2001. The County Office requested an opinion again from the OCC about how the annuity contract purchased from the couple's funds should be counted in reference to the couple's countable assets. The OCC's opinion remained that the annuity should be considered in the Petitioner's eligibility determination as well as that it failed as a permissible transfer because someone

other than the spouse could benefit from the annuity (the children are the secondary beneficiaries rather than the annuitant's spouse, Mrs. Schroder).

3.    The Family Support Specialist denied the application based on the opinion, but did not provide evidence of the couple's resources at the time [of] this application. Both attorneys agreed at the hearing that the only issue on this appeal would be the effect of the annuity on the couple's resources. Therefore, no evidence concerning the couple's other resources is considered and these resources would need to be determined for the date of application if a determination was made that the annuity was not an impermissible transfer or a countable resource to the couple.

As the hearing officer pointed out, the only reason the issue of the Schroders' other assets might have an impact on this case is if it is determined that the annuity is not a countable asset. If it is a countable asset, then it must be included by DHS in computing the Schroders' financial resources as of April 2001. Thus, in the favor of judicial economy, the wise approach to this case would be to determine the issue of the countability of the asset, as it is the controlling issue regarding Mrs. Schroder's Medicaid eligibility.

I am well aware that this court has a long-standing rule that it will not issue advisory opinions. Typically, when this court declines to address an issue raised by a party it is because there is no issue in controversy, thus rendering any decision a mere advisory opinion. *See Worth v. City of Rogers*, 341 Ark. 12, 14 S.W.3d 471 (2000); *Jenkins v. Bogard*, 335 Ark. 334, 980 S.W.2d 270 (1998). In the case before us now, however, there is a clear controversy, namely the status of the annuity as a countable asset, and this court should address the controversy at hand.

For the foregoing reasons, I respectfully dissent.

GLAZE, J., joins this dissent.