Tod HALL *v.* Doug FREEMAN

96-179                                                      936 S.W.2d 761

Supreme Court of Arkansas
Opinion delivered February 3, 1997
[Petition for rehearing denied March 24, 1997.*]

*Melinda R. Gilbert*, for appellant.

*Randell Templeton*, for appellee Doug C. Freeman.

---

\* BROWN, J., dissents. *See* 327 Ark. 720, 942 S.W.2d 230 (1997), for supplemental opinion.

DAVID NEWBERN, Justice. In 1994, almost six years after being divorced from his ex-wife, Jamie McFall, Doug Freeman sued her and Tod Hall. The complaint alleged that Tod Hall was the father of Stuart Freeman, a child conceived and born during the marriage of Doug Freeman and Jamie McFall. A guardian *ad litem* was appointed to represent Stuart's interests. The guardian moved, along with Mr. Freeman, for blood (DNA) tests to determine the paternity of the child. The Chancellor held Mr. Freeman's complaint was barred due to the *res judicata* effect of the divorce decree which recited the child was "born of this marriage." She held, however, that Stuart was not barred, so the paternity action could be pursued on his behalf. Based on the DNA evidence, Mr. Hall was held to be the father of Stuart. The order changed the child's name from Freeman to Hall, relieved Mr. Freeman of the support obligation, and required Mr. Hall to assume it. We reverse and remand because a child conceived and born of a marriage, and thus presumed to be the child of the marital partners, has no standing to bring a paternity action.

Mr. Freeman and Ms. McFall were married in 1983. Stuart was born in 1987. At the hearing on Mr. Freeman's petition there was ample evidence that Mr. Hall and Ms. McFall (then Freeman) engaged in sexual intercourse during the time Stuart was conceived. Ms. McFall testified that she and Mr. Freeman did not engage in sexual intercourse at that time. She further testified, as did Mr. Hall, that Mr. Hall was made aware that he was the father of Stuart shortly after Ms. McFall learned she was pregnant. Mr. Freeman was told that Mr. Hall was the father of Stuart some three or four months after Stuart's birth; thus he knew of it well in advance of filing his divorce complaint in which he pleaded that "The parties have one minor child, Stuart D. Freeman."

Evidence of the DNA test presented at the paternity hearing excluded Mr. Freeman as the father and concluded there was a 99.97% probability that Mr. Hall was Stuart's father.

Mr. Hall presents many arguments in favor of reversal. As we reverse solely on the standing issue, we need not address the other contentions. Mr. Freeman has not cross-appealed the Chancel-

lor's decision barring his claim on the basis of the *res judicata* effect of the divorce decree.

In her order, the Chancellor cited cases from other jurisdictions to the effect that a child is not barred from bringing a paternity suit even though a prior divorce decree had described the child as being "of the marriage." *State ex rel. Cline v. Pentasuglia,* 457 S.E.2d (W.Va. 1955). *See also People in re: M.C.,* 895 P.2d 1098 (Colo. App. 1994). We have no quarrel with the principles of law stated in those cases. Paternity actions are, however, governed by statute in Arkansas. Ark. Code Ann. §§ 9-10-101 through 9-10-120 (Repl. 1993 and Supp. 1995).

Section 9-10-104 provides as follows:

> Petitions for paternity establishment may be filed by:
> (1) A biological mother;
> (2) A putative father;
> (3) A person for whom paternity is not presumed or established by court order; or
> (4) The Department of Human Services.

Stuart, who through his guardian *ad litem* effectively became the petitioner in this case, obviously does not fall within the first, second, or fourth category. To fall within the third category, Stuart must be one for whom paternity is neither presumed nor established by court order. Stuart is a person for whom paternity is presumed.

In *Thomas v. Pacheco,* 293 Ark. 564, 740 S.W.2d 123 (1987), Ms. Pacheco alleged that Mr. Thomas was the father of her child conceived and born during her marriage to Mr. Pacheco, and it was so held at the trial level. A blood test showed Mr. Pacheco was not the father and a 95.5% probability that Mr. Thomas was. We held that the blood test evidence should have been excluded because of failure to follow statutory guidelines in the procurement of it. We also held that testimony of Mr. and Ms. Pacheco to the effect that they had no access to one another at the time of conception was inadmissible because of Lord Mansfield's rule. The majority opinion noted the modern-day criticism of the rule, and the dissenting opinion pointed out, "Any rule adopted more

than two hundred years ago that espouses fiction over fact needs to be reexamined."

■ Lord Mansfield's rule is a rule of evidence not at issue here. The important aspect of the *Thomas* case is this statement:

> [T]here is more at issue than a rule of evidence. Marriage is still considered an honorable institution; children born during marriage should be deemed legitimate, and legal efforts to declare such children illegitimate are not and should not be made easy.
>
> Belief in that principle is so great that we have created a legal presumption to protect it. This presumption, that a child born during marriage is the legitimate child of the parties to that marriage, is one of the strongest presumptions recognized by the law. *See Jacobs v. Jacobs,* 146 Ark. 45, 225 S.W. 22 (1920).

*See also Willmon v. Hunter,* 297 Ark. 358, 761 S.W.2d 924 (1988).

■ Nothing in the statutes creating the paternity action purports to do away with the presumption of legitimacy of a child born during marriage. We can only assume that presumption is the one to which reference is made in § 9-10-104(3) and that the General Assembly has indeed seen fit to preserve it as a bar to an action by a child born during a marriage. Because it was thus error for the Chancellor to permit the paternity action to be pursued on behalf of Stuart, we must reverse.

Reversed and remanded.

BROWN, J., dissents.

ROBERT L. BROWN, Justice, dissenting. The decision today forces the child, S.F., now age 9, to live a lie for the remainder of his life in light of the fact that the DNA proof is clear that Tod Hall is his natural father. The majority holds that S.F. has no standing under the governing statute to petition the court to determine who is his natural father. *See* Ark. Code Ann. § 9-10-104 (Repl. 1993). But here, Doug Freeman, who claimed in his complaint that he was merely the putative father of S.F., filed the paternity action. Furthermore, the biological mother, Jamie McFall, asserted in her answer that it was in S.F.'s best interests to have the DNA testing done and to determine paternity. In her prayer, she requested that the testing be done. The chancellor then consolidated Freeman's paternity action with the previous

divorce action and appointed a guardian to represent S.F.'s interests. DNA testing was performed at the request of both Doug Freeman and S.F.'s guardian, as well as Jamie McFall, and it showed beyond a shadow of a doubt that Tod Hall was the natural father. Hence, everyone but Tod Hall agreed that the testing should be done.

Under these facts, the standing requirements of the paternity statute were satisfied in my judgment, and the determination of paternity could proceed. Moreover, once DNA testing was performed showing the probability that Tod Hall was S.F.'s father to be 99.97%, any presumption that S.F. was Doug Freeman's natural child flew out the window. It is true that the chancellor ultimately ruled that Freeman could not contest paternity because his previous divorce decree referred to S.F. as being born of the marriage. But that conclusion was reached by the chancellor after the DNA testing was completed. A successful defense raised by Tod Hall does not negate Freeman's standing to file the suit initially and ask for DNA testing with the concurrence of the biological mother. Nor does it vitiate S.F.'s right to have the matter proceed to conclusion after the DNA results were furnished.

In a sense, DNA testing has changed the rules of the game regarding paternity. Though I believe a statutory mechanism was in place, under these facts, to afford Freeman, McFall, and S.F. the right to have S.F.'s natural father identified, the General Assembly would do well to examine § 9-10-104 and weigh the competing policies involved in this case.

In short, I believe that Doug Freeman had sufficient standing to file the paternity action, as an alleged putative father, and to request DNA testing, with the concurrence of Jamie McFall and the guardian for S.F. After the testing, S.F. was not presumed to be legitimate. Under these circumstances, S.F. had the right to have his natural father identified as between Doug Freeman and Tod Hall. I respectfully dissent.