61 S.W.3d 149 (2001)
347 Ark. 203
R.N.,
v.
J.M. and B.M.
No. 01-174.
Supreme Court of Arkansas.
December 6, 2001.
*150 Barrett & Deacon, A Professional Association, by: D. Price Marshall Jr. and James F. Gramling, Jr., Jonesboro, for appellant.
Goodwin, Moore, Colbert, Broadway & Gray, LLC, by: Harry Truman Moore and Mary L. Broadway, Paragould, for appellees.
JIM HANNAH, Justice.
Appellant R.N. appeals the decision of the Craighead County Chancery Court[1] denying his petition to establish paternity of a minor child, A.M., who was born to *151 Appellee J.M. during her marriage to Appellee B.M. J.M. and B.M. are still married. In this appeal, we are asked to interpret and harmonize Ark.Code Ann. §§ 9-10-104 (Repl.1998 and Supp.2001), 9-10-108 (Repl.1998 and Supp.2001), and XX-XX-XXX (Repl.1999), which deal with the establishment of paternity.
The facts of this case are essentially undisputed. J.M. and B.M. were married in 1992 and are still married. Between late 1996 and early 1997, J.M. and R.N. were involved in an ongoing sexual relationship. During this period of time, J.M. continued to have sexual relations with her husband, B.M. J.M. gave birth to a child, A.M., on August 17, 1997. A.M. has lived with J.M. and B.M. since her birth. While R.N. claims that J.M. told him that "she was 99 percent sure the child was his," J.M. claims she only said "it was like 95 percent sure" that R.N. was the father of the child. Although R.N. has not established a relationship with A.M., he testified that he wanted to establish a relationship with the child, but that J.M. would not allow him to see her. Since A.M.'s birth, R.N. has seen the child on two occasions, once at J.M.'s home and again at R.N.'s office.
On April 7, 1998, R.N. filed the petition for paternity, and on April 20, 1998, he filed a motion for paternity testing pursuant to Ark.Code Ann. § 9-10-108. J.M. responded denying that R.N. is A.M.'s father and moved to dismiss the action on three grounds: (1) R.N. lacked standing because A.M. is presumed to be legitimate, and the Arkansas paternity statutes only apply to illegitimate children; (2) R.N. has no constitutionally protected interest because he has not established a relationship with A.M.; and (3) R.N. should be equitably estopped from bringing the paternity action because he waited until A.M. was almost nine months old before filing the paternity action.
After a hearing on August 31, 1999, the chancellor granted J.M.'s motion to dismiss R.N.'s petition for paternity. In the order entered on August 15, 2000, the court found that as a matter of law R.N. lacked standing to bring the paternity action and that he is equitably estopped from bringing the action. The trial court also adopted as its conclusions of law the legal arguments in J.M.'s motion to dismiss and brief in support of the amended response to the motion for paternity testing. The pleadings were incorporated by reference in the court's order.[2]
I. Standing
In his first point on appeal, R.N. argues that section 9-10-104 of the Arkansas paternity statutes grants him standing and that section 9-10-108 requires the trial court to order paternity or DNA testing upon motion of either party. See Ark. Code Ann. §§ 9-10-104 and 9-10-108. In response, J.M and B.M. contend that R.N. lacks standing under section 9-10-104 because that section grants standing to a putative father only when the child is illegitimate, and A.M. is presumed to be legitimate as she was conceived and born during marriage. J.M. and B.M. further assert that paternity testing should be controlled by Ark.Code Ann. § 16-43-901, which permits the trial judge to order paternity testing if the judge concludes such testing is in the child's best interest. R.N. responds that section 9-10-104 specifically grants a putative father the right to petition to establish paternity even *152 when the child is presumed legitimate. He states that even though being conceived and born during marriage creates a presumption of legitimacy, that presumption is rebuttable by evidence of impotency, lack of access between husband and wife, or genetic testing. R.N. argues that the use of the phrase "the trial court shall order" in section 9-10-108 makes genetic testing mandatory upon either party's motion. He relies on our canon of statutory interpretation that a general statute must give way to a specific statute to support his contention that the mandatory language of section 9-10-108 controls because it is specific to a paternity action; whereas, the permissive language in section 16-43-901 is general in that it applies to any court action.
The resolution of the question of R.N.'s standing to petition for paternity requires us to interpret the Arkansas paternity statutes. We review issues of statutory construction de novo because it is our responsibility to determine what a statute means. Clemmons v. Office of Child Support Enforcement, 345 Ark. 330, 47 S.W.3d 227 (2001) (citing Stephens v. Arkansas School for the Blind, 341 Ark. 939, 20 S.W.3d 397 (2000) and Hodges v. Huckabee, 338 Ark. 454, 995 S.W.2d 341 (1999)). While we are not bound by the trial court's ruling, we will accept the trial court's interpretation of a statute unless it is shown that the trial court erred. Id. The purpose of statutory interpretation is to give effect to the intent of the General Assembly. Ford v. Keith, 338 Ark. 487, 996 S.W.2d 20 (1999). We first seek the legislature's intent by giving the words of the statute their ordinary and usual meaning in common language. Stephens v. Arkansas School for the Blind, 341 Ark. 939, 20 S.W.3d 397 (2000). Where the meaning is clear and unambiguous, we do not resort to the rules of statutory interpretation. Id.
R.N. filed his petition to establish his paternity of A.M. under section 9-10-104 of the paternity statutes. This section was amended by Act 1184 of 1995 to read as follows:
9-10-104. Suit to determine paternity of illegitimate child. Petitions for paternity establishment may be filed by:
(1) A biological mother;
(2) A putative father;
(3) A person for whom paternity is not presumed or established by court order; or
(4) The Office of Child Support Enforcement.[3]
R.N. asserts that section 9-10-104 plainly creates standing for him as a putative father. A "putative father" is defined throughout the Arkansas Code as any man not legally presumed or adjudicated to be the biological father of a child, but who claims or is alleged to be the biological father of the child. See Ark.Code Ann. §§ 9-9-501(11) (Repl.1998), 9-27-303(42) (Supp.2001), 16-43-901(h) (Repl.1999), 20-18-701(5) (Repl.2000). R.N. claims to be the biological father of A.M., but he is not legally presumed or adjudicated to be the biological father of A.M. Thus, R.N. is, by statutory definition, a putative father.
*153 As to the phrase, "[s]uit to determine paternity of illegitimate child," that now appears in section 9-10-104, R.N. contends that it is merely a descriptive heading, and descriptive headings in the code do not have the effect of law. R.N. is correct that descriptive headings in the code are not law. See Ark.Code Ann. § 1-2-115(b) (Repl.1996) ("(b) Unless otherwise provided in this Code, ... the descriptive headings or catchlines immediately preceding or within the text of the individual sections... do not constitute part of the law and shall in no manner limit or expand the construction of any section."). While it is true that a previous version of section 9-10-104, as amended by Act 725 of 1989, did not include the above-quoted descriptive heading, it is now a part of the statute after the General Assembly amended section 9-10-104 in 1995 and included the heading or title of the statute in the enactment of the statute, thus making the heading itself part of the statute. See 1995 Ark. Acts 1184.
Without this phrase, the statute would clearly grant R.N. standing. We must, therefore, determine whether the language in the descriptive heading that is now a part of the statute effectively denies R.N. standing to petition for the establishment of A.M.'s paternity. The paternity statutes do not provide us with a definition of the term "illegitimate child," but this court has defined that term in Willmon v. Hunter, 297 Ark. 358, 360, 761 S.W.2d 924, 925 (1988): "[A]n illegitimate child is a child who is born at the time that his parents, though alive, are not married to each other." The paternity statutes at that time provided that "any man alleging to be the father of an illegitimate child may petition... for a determination of the paternity of the illegitimate child." Ark.Code Ann. § 9-10-104(a) (1987).
We also reiterated in Willmon the general principle of law that a child is presumed legitimate if the parents were married at the time of the child's conception or birth. Id. This principle has been recognized by the General Assembly when enacting laws concerning inheritance. See Ark.Code Ann. § 28-9-209 (1987). In Willmon, we held that the presumption of legitimacy of a child born during a marriage, as well as the presumption of legitimacy of a child conceived but not born during the marriage, are rebuttable and do not preclude a party from litigating the issue of paternity. Willmon v. Hunter, supra. See also, Thomas v. Pacheco, 293 Ark. 564, 740 S.W.2d 123 (1987) (permitting the mother to litigate the issue of illegitimacy even though the child was conceived and born during marriage). In other words, even when the term "illegitimate child" was included within the text of the statute, and not merely in the descriptive heading, we have held that a putative father was not precluded from petitioning to determine paternity in cases where the child was presumed legitimate.
The General Assembly included a reference to the term "illegitimate child" in the 1995 amendments to the paternity statutes knowing of our earlier decisions that a presumption of legitimacy is rebuttable notwithstanding the specific reference to that same term in a previous version of section 9-10-104. See Thomas v. Pacheco, supra., and Willmon v. Hunter, supra. "[W]hen the construction of a statute is at issue, we will presume that the General Assembly, in enacting it, possessed the full knowledge of the constitutional scope of its powers, full knowledge of prior legislation on the same subject, and full knowledge of judicial decisions under preexisting law." Davis v. Old Dominion Freight Line, Inc., 341 Ark. 751, 756, 20 S.W.3d 326, 329 (2000). Because *154 the legislature is presumed to have known of our decisions, we conclude that the plain language of section 9-10-104 grants R.N. standing to petition to determine the paternity of A.M. In other words, it gives R.N. the opportunity to bring his cause before the court.
Although section 9-10-104 gives R.N. standing to petition for paternity, at issue here is whether paternity testing is mandatory under section 9-10-108 or discretionary under section 16-43-901 in relation to these facts. R.N. urges this court to hold that the trial court erred in refusing to order the DNA testing as requested in his motion for paternity testing pursuant to Ark.Code Ann. § 9-10-108. The trial court applied section 16-43-901, which is permissive and allows a trial court to determine what is in the child's best interest before ordering a paternity test. See Ark.Code Ann. § 16-43-901(g). R.N. argues that the mandatory testing required under section 9-10-108 should control because it is a specific statutory right to DNA testing in the course of a paternity proceeding, and the best interest analysis should be done after the trial court has the benefit of all the material facts, including the DNA or paternity test.
Whether sections 9-10-108 and 16-43-901 conflict is a question of statutory interpretation. We have often noted that "[i]t has long been the law in Arkansas that a general statute must yield when there is a specific statute involving the particular subject matter." Shelton v. Fiser, 340 Ark. 89, 94, 8 S.W.3d 557, 560 (2000). See also, Board of Trustees v. Stodola, 328 Ark. 194, 942 S.W.2d 255 (1997); Donoho v. Donoho, 318 Ark. 637, 887 S.W.2d 290 (1994); Conway Corp. v. Construction Eng'rs, Inc., 300 Ark. 225, 782 S.W.2d 36 (1989). However, statutes relating to the same subject are said to be in pari materia and should be read in a harmonious manner, if possible. Stephens, supra; Minnesota Mining & Mfg. v. Baker, 337 Ark. 94, 989 S.W.2d 151 (1999).
While the language of the two statutes appears at first to be in conflict, a full reading of the statutes and the situations to which they apply clarify that section 16-43-901 is the more specific of the two and can be applied harmoniously with section 9-10-108. Under section 9-10-108, the trial court is directed that it "shall" order testing upon the motion of either party to the paternity action; whereas, under section 16-43-901 the trial court "may" order testing where it can assist the trial judge in the determination of paternity in the particular situation where the child is presumed legitimate by being born during the marriage of the mother and her husband. Section 16-43-901(g) instructs the trial court to consider the best interest of the child in determining paternity in the specific situation when the child is presumed legitimate; whereas, section 9-10-108 contains no such instruction for the general determination of paternity. By finding that section 16-43-901 addresses a more limited and specific situation than does section 9-10-108, we not only can address the particular situation of determining the true parentage of a presumed legitimate child born of a marriage, but the court can also harmonize these two statutory sections.
As the court of appeals noted in Leach v. Leach, 57 Ark.App. 155, 942 S.W.2d 286 (1997), Act 657 of 1989, codified at section 16-43-901, abolished Lord Mansfield's Rule. The court of appeals stated:
The common-law rule, articulated in 1777, states the declarations of husband and wife cannot be admitted to bastardize a child born after marriage. The statute now permits a mother, her husband, and a putative father to testify about the paternity of a child. However, *155 the strong presumption of the legitimacy of a child born of marriage continues to be one of the most powerful presumptions in Arkansas law. Only upon clear and convincing evidence may the court find this presumption overcome. This statute also provides:
The court shall consider foremost the interest of the child in making any determination hereunder and consider only testimony and evidence which will serve the best interest of the child in its findings pursuant to this section.
Id. at subsection (g)(2).
In Leach, the court of appeals reversed the chancellor's decision to award custody of two children born of the marriage, although the older child was admittedly not the husband's, to the mother so that the children would not be separated, although the father had had temporary custody during the divorce proceedings. While the issue of paternity testing did not arise in that case because the husband and wife did not make it an issue, the issue of paternity itself was raised sua sponte by the court. The chancellor determined that because the older child was not the husband's, the husband could not have custody of her. The court of appeals reversed because illegitimizing the daughter was not in her best interest under the facts of that particular case. The court of appeals recognized that in considering paternity involving a child born of a marriage whose legitimacy is presumed, such a special and specific situation arises requiring the chancellor to step in and exercise discretion to determine an outcome in the best interest of the child whose life will be most affected by any change in parentage. See Ark. Code Ann. § 16-43-901(g)(1) and (2). While Leach has no precedential value for us, its reasoning is sound and in accordance with the application of this statute to this specific situation. The discretionary "may" language in section 16-43-901(e)(1) allows a chancellor to consider the particular circumstances of each case and the child's best interest before ordering a paternity test that could forever change a child's life, perhaps merely because the adults who caused such a tumultuous situation are curious to know the results of their infidelity.
Furthermore, because the bulk of section 16-43-901 addresses such a specific situation rather than the general situation of establishing paternity under section 9-10-108, R.N.'s contention that section 9-10-108 is more specific merely because it uses the word "shall" is in error. By reaching that conclusion, we would necessarily void the language in section 16-43-901(e)(1), which gives the trial judge discretion to order the test if it assists the court in the determination of parentage after considering the child's best interest under section 16-43-901(g)(2). Instead, by our determination that section 16-43-901 is more specific in its application to this particular type of paternity challenge than the general paternity-testing statute at section 9-10-108, both statutes can be read in harmony to recognize that the presumption of legitimacy of a child born during a marriage is a presumption to protect the child whose interests should be considered first and foremost. And while this presumption is rebuttable according to law, the challenging party must first show that rebutting that presumption is in the best interest of a child whose parents were married at the time the child was born and perhaps, as in this case, remain married and plan to continue as the only parents the child has ever known.
Opponents to our decision would argue that giving the trial judge discretion in such a case would erase a putative father's ability to rebut the presumption of legitimacy where perhaps the only way to rebut *156 that presumption is through DNA testing. However, it is this discretion in section 16-43-901 that allows the trial judge to provide the necessary level of objective reasoning to protect the best interest of a child who is presumed legitimate while still considering the interests of a putative father or other party who seeks to rebut the presumption. Otherwise, the presumption of legitimacy loses any real meaning if a putative father, for instance, has the ability, by merely requesting a paternity test, to forever change the presumed legitimacy of a child born of a marriage. We are not willing to minimize this presumption where section 16-43-901 clearly addresses a specific situation in which paternity is challenged within the larger and less specific arena of paternity challenges under section 9-10-108.
In two particular cases in the 1980s, we addressed the issue of a party's ability to challenge paternity when a child is presumed legitimate. In Thomas v. Pacheco, supra, we allowed a mother to litigate the issue of paternity even though the child was conceived and born during her marriage. We noted that while there is a strong presumption of legitimacy for a child born during marriage, the presumption was rebuttable by evidence of the father's impotence or the non-access of the parties. Id. We reversed the trial court's findings concerning paternity for two reasons. One, the trial court erred in allowing the husband and wife to testify concerning non-access during the period of conception. Lord Mansfield's Rule, a rule of evidence dating back to the 1770s and adopted in Arkansas in 1915, prohibited a husband or wife from testifying concerning non-access of the husband. Thus, the trial judge abused his discretion in allowing the testimony. Id. Second, we held that even though blood tests established a 99.5% probability that the husband was not the father, the court failed to follow the required procedure by allowing a telephone deposition, rather than a personal appearance, by the doctor who performed the test. Id. Significantly, we did not dismiss the case but remanded it, allowing the parties to continue to litigate the issue of paternity in spite of the presumption of legitimacy and the wording of the statute that appeared to limit petitions to cases of an illegitimate child. Id.
In Willmon v. Hunter, supra., we upheld the right of a putative father to litigate the issue of paternity over the presumption of legitimacy of a child conceived during marriage but born out of wedlock. In deciding that case, we held that the presumption of legitimacy was not irrebuttable. We also held that there was no public policy that would prohibit a putative father from seeking to establish his paternity of a child presumed legitimate. Id. In 1988, we held that a putative father was not entitled to notice because he did not avail himself of his rights to petition for paternity or take other affirmative action to establish a relationship with the child. In re the Adoption of S.J.B., 294, Ark. 598, 745 S.W.2d 606 (1988). Furthermore, we stated: "The Arkansas law governing the establishment of paternity by the county court is applicable to all putative fathers." Id. at 603. The Willmon holding, like the Pacheco and Adoption of S.J.B. holdings, were made under the 1981 statute, the text of which specifically referred to an illegitimate child.
While these cases establish that a putative father or other recognized party under section 9-10-104 may petition to establish paternity, a matter we do not dispute here, any further application of those decisions to this case must fail. Those cases were decided prior to the enactment of section 16-43-901 through Act 657 of 1989, which generally did away with Lord Mansfield's Rule. Thus, while Thomas v. Pacheco and *157 Willmon v. Hunter recognize a party's standing to challenge presumed paternity, the language in section 16-43-901 still retains the trial judge's discretion to consider first and foremost the best interest of the child before making any decision regarding the receipt of evidence, including whether to order DNA tests. See Ark. Code Ann. § 16-43-901(e)(1) and (g)(2).
In conclusion on this issue, we find that the trial court erred in holding that R.N. did not have standing to petition to establish paternity. We reverse and remand to the circuit judge with the instruction that prior to ordering paternity testing, the circuit judge shall first conduct a hearing to determine whether it is in the best interest of the child to order a paternity test pursuant to section 16-43-901(g)(2), and then to further determine any related issues pursuant to the directives of that statute.
II. Equitable Estoppel
Even though R.N. has statutory standing, J.M. and B.M. assert that R.N. should be equitably estopped from bringing a paternity action because he waited until A.M. was almost nine months old before initiating the action. R.N. argues that J.M. and B.M. failed to present sufficient facts to meet their burden of proof on the elements of equitable estoppel. The trial court ruled that as a matter of law, R.N. was estopped from pursuing his paternity action. We review chancery cases de novo on the record, but we will not reverse a chancellor's findings of fact unless they are clearly erroneous. Wisener v. Burns, 345 Ark. 84, 44 S.W.3d 289 (2001).
We have defined equitable estoppel as "a judicial remedy by which a party may be precluded by its own act or omission from asserting a right to which it otherwise would have been entitled, or pleading or proving an otherwise important fact." Clemmons, 345 Ark. at 352, 47 S.W.3d 227 (citing 28 AM.JUR.2d Estoppel and Waiver, Page 353 § 28 (2000)). We have established four necessary elements of equitable estoppel:
(1) the party to be estopped must know the facts; (2) the party to be estopped must intend that his or her conduct be acted on or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the latter must be ignorant of the true facts; and (4) must rely on the former's conduct to his or her injury.
Miller County v. Opportunities, Inc., 334 Ark. 88, 96, 971 S.W.2d 781 (1998). The essence of J.M. and B.M.'s estoppel argument is that R.N. should be estopped from bringing a paternity action because, although he knew that he was probably A.M.'s biological father, he allowed B.M. to establish and develop a close relationship with A.M. during the first nine months of the child's life.
B.M., as the proper party to assert the equitable estoppel claim, had the burden of proving each of the four elements of equitable estoppel. However, there is no proof in the record as to what B.M. knew and when, although at some point he knew there was a question about A.M.'s paternity. Furthermore, B.M. offered no evidence to show that he relied on R.N.'s conduct to his detriment. We must therefore conclude that, without the strict proof necessary to support B.M.'s estoppel claim, the trial court was clearly erroneous in concluding that R.N. was equitably estopped from bringing the paternity action as a matter of law.
III. Equal Protection
The dissent asserts that by reaching this conclusion we are violating the Equal Protection Clause of the Fourteenth *158 Amendment of the United States Constitution because we are "discriminating" against illegitimate children by not providing them a "best interest" hearing upon the determination of paternity. Nothing could be further from the truth.
To begin with, we note that none of the parties to this action raised this issue in the trial court, and they do not attempt to raise the issue in their briefs to this court. The dissent raises this issue sua sponte despite our longstanding rule that, with the notable exception of matters involving subject-matter jurisdiction, we will not consider issues raised for the first time on appeal, even where the issue is a matter of constitutional magnitude. Furman v. Holloway, 312 Ark. 378, 383, 849 S.W.2d 520, 523 (1993); Burke v. Strange, 335 Ark. 328, 983 S.W.2d 389 (1998), Tabor v. State, 333 Ark. 429, 971 S.W.2d 227 (1998).
On the merits, the dissent bases its argument on Gomez v. Perez, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973), a case in which the United States Supreme Court determined that a Texas court's action in a paternity and support case violated the Equal Protection Clause. In Gomez, the appellant filed a petition in Texas District Court seeking support from the appellee on behalf of her minor child. After a hearing, the state trial judge found that appellee was "the biological father" of the child, and that the child "needs the support and maintenance of her father," but concluded that because the child was illegitimate "there is no legal obligation to support the child and the Plaintiff take nothing." The Court of Civil Appeals affirmed this ruling over the objection that this illegitimate child was being denied equal protection of law. The Texas Supreme Court refused application for a writ of error, finding no reversible error. On review, the Supreme Court held that a state may not "invidiously discriminate" against illegitimate children by denying them substantial benefits accorded children generally, and that once a state creates a judicially enforceable right on behalf of children for necessary support from their natural fathers, there is no constitutionally sufficient justification for denying these necessary rights to a child simply because her natural father has not married her mother, and such denial is a denial of equal protection.
Clearly, the Court in Gomez saw that providing fewer rights to a child simply because he or she is illegitimate is a violation of equal protection. The Gomez case and its holding neither factually nor substantively apply here, however. Rather, in this case, by requiring paternity testing under Ark.Code Ann. 9-10-108 in a case involving an illegitimate child, the courts will actually be effectuating the intent of the United State Supreme Court in Gomez by requiring that illegitimate children who do not have a father will not only be able to establish parentage, but will also be afforded all of the rights and benefits accorded children who are presumed legitimate. Hence, the "best interest" of an illegitimate child, including but not limited to the rights and benefits of having a father and the right of receiving support from the father, will always be to have parentage established for an illegitimate child, thus negating any need for a "best interest" hearing under Ark.Code Ann. § 16-43-901. The State, as well, will benefit from the establishment of paternity for an illegitimate child where certain support obligations will transfer to the rightful bearer of those responsibilities. Furthermore, required testing under Ark.Code Ann. § 9-10-108 in a case involving an illegitimate child actually raises the rights of an illegitimate child to the same level as those who are presumed legitimate, thus *159 satisfying the Equal Protection Clause by actually conferring upon them "substantial benefits accorded to children generally." Gomez, 409 U.S. at 538, 93 S.Ct. 872.
As a final point, R.N. argues that the trial court erred in ruling that he did not have a protectable constitutional interest that would grant him standing. Because we have ruled that R.N. has statutory standing to bring the petition, we need not address this point.
Reversed and remanded.
THORNTON, J., concurs.
GLAZE, BROWN, and IMBER, JJ., dissent.
RAY THORNTON, Justice, concurring.
The majority of the court has decided that R.N. has standing under Ark.Code Ann. § 9-10-104 (Repl.1998) to bring a paternity action challenging the legitimacy of a child, A.M., who is presumed to be legitimate because she was both conceived and born during the continuing marriage of her parents, J.M. and B.M. Both J.M. and B.M., the married couple to whom A.M. was born, strongly object to R.N.'s efforts to have the child declared illegitimate.
The public policy of our state regarding the presumption of legitimacy of a child born during marriage was declared in Thomas v. Pacheco, 293 Ark. 564, 740 S.W.2d 123 (1987), where we stated:
Marriage is still considered an honorable institution; children born during marriage should be deemed legitimate, and legal efforts to declare such children illegitimate should not be made easy. Belief in that principle is so great that we have created a legal presumption to protect it. This presumption, that a child born during marriage is the legitimate child of the parties to the marriage, is one of the strongest presumptions recognized by the law.
Thomas, supra (citing Jacobs v. Jacobs, 146 Ark. 45, 225 S.W. 22 (1920)). We also made a strong public policy declaration in support of the presumption of the legitimacy of a child born during marriage in Hall v. Freeman, 327 Ark. 148, 936 S.W.2d 761 (1997), where we stated: "Nothing in the statutes creating the paternity action purports to do away with the presumption of legitimacy of a child born during marriage." Id.
However, the majority of the court today holds that the legislature did not mean what it said when it enacted Act 1184 of 1995, which clearly states who has standing to bring a paternity action in a suit to determine the paternity of an illegitimate child. Act 1184 of 1995, which is codified at Ark.Code Ann. § 9-10-104, provides in its entirety:
Be it Enacted by the General Assembly of the State of Arkansas:
SECTION 1. Arkansas Code § 9-10-104 is hereby amended to read as follows:
"9-10-104. Suit to determine paternity of illegitimate child. Petitions for paternity establishment may be filed by:
(1) A biological mother;
(2) A putative father;
(3) A person for whom paternity is not presumed or established by court order; or
(4) The Office of Child Support Enforcement."
Id.
While I have great difficulty in comprehending the reasoning employed by the majority in conferring standing upon R.N., I recognize that the majority of this court has authority to interpret the statute. It has done so in today's opinion by declaring that R.N. has standing to bring a paternity *160 action under Ark.Code Ann. § 9-10-104. Accordingly, I reluctantly accept the majority's conclusion to confer standing upon R.N.
However, accepting that R.N. has standing to bring a paternity action, as declared by today's decision, I wholeheartedly agree with the majority's decision that, pursuant to Ark.Code Ann. § 16-43-901 (Repl.1998), the best interests of the child should be considered by the trial court before ordering a blood test.
For these reasons, I respectfully concur.
ROBERT L. BROWN, Justice, dissenting.
I agree with Justice Imber's dissenting opinion. But like Justice Thornton in his concurring opinion, I am troubled by the General Assembly's enactment of Act 1184 of 1995, which lists who has standing to sue to determine paternity. Act 1184 reads:
Be It Enacted by the General Assembly of the State of Arkansas:
SECTION 1. Arkansas Code § 9-10-104 is hereby amended to read as follows:
"9-10-104. Suit to determine paternity of illegitimate child. Petitions for paternity establishment may be filed by:
(1) A biological mother;
(2) A putative father;
(3) A person for whom paternity is not presumed or established by court order; or
(4) The Office of Child Support Enforcement of the Revenue Division of the Department of Finance and Administration."
Act 1184 of 1995 (emphasis added).
The critical question for me is where did the language "9-10-104. Suit to determine paternity of illegitimate child.", which is included in Act 1184, come from? In reviewing Act 725 of 1989, which rewrote § 9-10-104, this language is not included. This means that under Act 725, paternity suits could be brought respecting either illegitimate or legitimate children. However, in checking the 1989 Pocket Supplement of the Family Law Code and the 1992 Replacement Volume as well, the language concerning an "illegitimate child" was added by the codifier as a heading to § 9-10-104, even though Act 725 made no reference to illegitimate children. Descriptive headings and titles added by a codifier, of course, are merely for convenient reference and do not have the force of law. Ark.Code Ann. § 1-2-115 (Repl. 1996).
Act 1184 of 1995 was a comprehensive act that amended forty-one statutes relating to the Office of Child Support Enforcement. In amending § 9-10-104, Act 1184 picked up the codifier's heading relating to paternity suits for illegitimate children as part of the enactment. Nowhere else in the Act is reference made to illegitimacy. The title of Act 1184 does not allude to illegitimate children, and no Emergency Clause is included in the Act. By adding the codifier's heading, Act 1184 of 1995 significantly amended Act 725 of 1989, which did not limit paternity suits to illegitimate children. Of course, this is a major policy shift. The question then is whether enacting a codifier's title was legislative error or not. Ordinarily, the presumption is made in favor of error-free enactments. Yet, I am reluctant to countenance a policy shift of such consequence based on the inclusion of a codifier's heading without any further statement by the General Assembly. It appears the General Assembly may well have inadvertently picked up the codifier's heading in comprehensive legislation without further consideration *161 and without intending to significantly alter the statute.
The General Assembly should review § 9-10-104 at its next legislative session in light of today's decision and other recent decisions of this court which relate to who can raise paternity questions and with respect to what children. This is a major policy issue that cries for clear resolution.
ANNABELLE CLINTON IMBER, Justice, dissenting.
I agree with the majority that Ark.Code Ann. § 9-10-104 (Repl.1998 and Supp. 2001) confers standing on R.N. to petition for the establishment of paternity. However, I disagree with the majority's conclusion that the substantive right to mandatory paternity testing provided in the paternity statutes should be discarded and replaced with an evidentiary statute that makes paternity testing permissive after a hearing on the best interest of the child. Furthermore, I must dissent because the majority has interpreted our paternity statutes in such a way as to offend the United States Constitution.
The majority would allow a putative father to have standing under section 9-10-104 of the paternity statutes, but then would strip him of his substantive right to mandatory paternity testing granted under section 9-10-108 if the child is presumed legitimate. Once a party has standing, that party has all the substantive rights that flow from standing. In the case of a paternity action, if a putative father has standing, he is entitled to all the substantive rights granted to him by the General Assembly under the paternity statutes, including those granted to either party under section 9-10-108. The majority concludes that the General Assembly intended for a putative father to have standing to file a paternity action where the child is presumed legitimate and also for the putative father to somehow lose standing when he attempts to invoke his right to mandatory testing. The majority cannot have it both wayseither a putative father has standing and all the rights that flow therefrom, or he does not. The General Assembly made it clear that he does.
Sections 9-10-108 of the paternity statutes and 16-43-901 both provide for genetic testing to establish paternity. The majority correctly points out that statutes dealing with the same subject matter should be read harmoniously if possible, but if the statutes conflict, then the more specific statute takes precedence over the more general statute. See Shelton v. Fiser, 340 Ark. 89, 94, 8 S.W.3d 557, 560 (2000); Minnesota Mining & Mfg. v. Baker, 337 Ark. 94, 989 S.W.2d 151 (1999). The majority asserts that the trial court should grant a motion to test for paternity only after conducting a hearing to determine the best interest of the child, not because section 9-10-108 of the paternity statutes authorizes the judge to do so, but because section 16-43-901 of the evidentiary statutes does.
The majority attempts to harmonize the two statutes by simply ignoring the rights granted to a party to a paternity action under section 9-10-108 if the child is presumed legitimate. A more consistent reading of the statutes is that they merely provide for paternity testing under two different circumstances. In a non-paternity case where evidence of paternity becomes an issue, section 16-43-901(g)(1) of the evidentiary statutes allows the trial court to order paternity testing under section (e)(1) after a hearing on the best interest of the child under section (g)(2). In a paternity case, section 9-10-108 of the paternity statutes grants a substantive right to the parties to request and obtain paternity testing without such a hearing. The facts in the instant case bring the *162 testing under the mandatory provisions of section 9-10-108 because paternity is the central issue of the case. If the General Assembly had intended for the paternity testing upon the motion of a party to a paternity action to be conditioned on a hearing to determine the best interest of the child, it could have done so. However, the General Assembly did not require such a hearing, and this court is not empowered to add that restriction to the statute.
The majority also states that to the extent section 9-10-108 and 16-43-901 conflict, section 16-43-901 should take precedence because it deals specifically with a situation in which the child is presumed legitimate. The majority does not disagree that if section 9-10-108 takes precedence, the plain language of the statute makes the paternity testing mandatory because of the use of the phrase "the trial court shall order...." Ark.Code Ann. § 9-10-108(a)(1). The majority's analysis of specific versus general statutes is flawed. The cases cited by the majority in support of the proposition that a general statute must yield to a statute specific to the subject matter are instructive on the issue of how to distinguish a specific statute from a general one. In Shelton v. Fiser, 340 Ark. 89, 90, 8 S.W.3d 557 (2000), the statute of limitations relating specifically to minor children in a medical malpractice case took precedence over a general statute of limitation for actions by minors. In Board of Trustees v. Stodola, 328 Ark. 194, 942 S.W.2d 255 (1997), the specific statute relating to forfeiture of personal property from drug trafficking took precedence over a general statute covering goods confiscated from any crime. In Donoho v. Donoho, 318 Ark. 637, 887 S.W.2d 290 (1994), a statute prohibiting setoffs for money judgments to a defendant after the plaintiff commenced suit against the defendant took precedence over a statute generally allowing setoffs in money judgments. In Conway Corp. v. Constuction Engineers, Inc., 300 Ark. 225, 782 S.W.2d 36 (1989), a statute not requiring a taxing unit to accept the lowest bid on public improvement contracts took precedence over a general statute requiring the acceptance of the lowest bid. In each case, the general or specific nature of a statute was determined by how broad a range of legal actions were covered by the statute in question. Where the statute specifically related to the subject matter of the case at bar, it took precedence over statutes that only generally related to the subject matter.
In reaching its conclusion, the majority states that section 16-43-901 is more specific than section 9-10-108 because it is limited to circumstances "in which the child is born during marriage and is presumed legitimate." This assertion is not supported by the plain language of the statute. The General Assembly clearly sets out the broad range of legal actions covered by section 16-43-901: "The purpose of this section is to enable the courts to receive into evidence relevant facts concerning the paternity of a child in any court proceeding or administrative hearing involving paternity or support obligation for a child." Ark.Code Ann. § 16-43-901(g)(1). (Emphasis added). On the other hand, the plain language of section 9-10-108 sets out its limited scope. "Upon motion of either party in a paternity action, the trial court shall order that the putative father, mother, and child to submit to scientific testing for paternity...." Ark.Code Ann. § 10-9-108(a)(1). (Emphasis added). Section 16-43-901 applies to legal proceedings in general, including administrative hearings. Section 9-10-108 is limited to paternity actions.
The instant case is a paternity action, and so, according to our caselaw, the statute that is specific to the subject matter takes precedence over a general statute *163 covering a broad range of legal proceedings. Section 9-10-108 specifically applies only to paternity actions and takes precedence over Section 16-43-901 that applies to a broad range of legal proceedings.
The majority's reliance on Leach v. Leach, 57 Ark.App. 155, 942 S.W.2d 286 (1997), is misplaced because Leach was a divorce action, not a paternity action under section 9-10-104. Id. The court of appeals correctly applied the general provisions of section 16-43-901 in Leach because it was a divorce action, and paternity testing under section 9-10-108 can only be initiated by a party to a paternity action. In the instant case, the paternity of A.M. has not been established. Once paternity is established, then the circuit court must, as the court of appeals required in Leach, consider the best interest of A.M. in matters of visitation, custody, support, or others issues affecting the child.
I must also dissent because the majority has interpreted the paternity statutes in a manner that calls into question their constitutionality under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The majority's decision creates two standards one for children presumed legitimate, and another standard for children not presumed legitimate. According to the majority opinion, after a paternity suit is initiated under section 9-10-104, if the child is presumed legitimate the trial court is to apply section 16-43-901 to a motion for paternity testing and only grant the testing if a hearing determines it is in the child's best interest to do so. However, if the child is not presumed legitimate, a motion for paternity testing is governed by section 9-10-108 and the testing is mandatory without a "best interest" hearing. Thus, a "best interest" hearing is afforded to a presumed legitimate child, but denied to a child not presumed legitimate. The United States Supreme Court has stated that "[A] State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded to children generally." Gomez v. Perez, 409 U.S. 535, 538, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973).
Because I believe that the majority's interpretation of sections 9-10-108 and 16-43-901 discriminates against children not presumed legitimate in violation of the Equal Protection guarantees of the Fourteenth Amendment, I must respectfully dissent.
GLAZE and BROWN, JJ., join in this dissent.
NOTES
[1] Pursuant to the passage of Arkansas Constitutional Amendment 80, which went into effect on July 1, 2001, our state courts are no longer separated into chancery and circuit courts. Rather, these courts have merged and now carry only the designation of "circuit court." Therefore, although the trial court in this case was originally a chancery court, in will herein be referred to as the circuit court.
[2] B.M. was allowed to intervene in this action on June 29, 1999, and he later joined J.M. in her motion to dismiss R.N.'s paternity suit.
[3] It should be noted that Act 1184 of 1995, as codified at Ark.Code Ann. § 9-10-104 (Repl. 1998) states as follows:

9-10-104. Suit to determine paternity of illegitimate child.
Petitions for paternity establishment may be filed by:
(1) A biological mother;
(2) A putative father;
(3) A person for whom paternity is not presumed or established by court order; or
(4) The Office of Child Support Enforcement of the Revenue Division of the Department of Finance and Administration.