ARKANSAS DEPARTMENT of HUMAN SERVICES *v.*
SILOAM SPRINGS NURSING & REHABILITATION

CA 04-962                                    214 S.W.3d 275

Court of Appeals of Arkansas
Opinion delivered September 28, 2005

392

*Richard N. Rosen*, for appellant.

*Kutak Rock LLP*, by: *Debby Thetford Nye* and *Amy M. Wilbourn*, for appellee.

ANDREE LAYTON ROAF, Judge. This case involves the interpretation of a Medicaid reimbursement rule promul-

gated by the Arkansas Department of Human Services (DHS) in 2001. Under the rule, a long-term care facility/Medicaid provider would be reimbursed for its services based upon a number of cost factors, including the fair rental value of its facility. Appellee Siloam Springs Nursing and Rehabilitation (Siloam) asked DHS to interpret the rule so that Siloam's pre-2001 renovations were considered in determining its fair rental value. DHS declined to do so, and its interpretation was upheld by a DHS hearing officer. Siloam appealed to circuit court, where the agency ruling was reversed. DHS now appeals from the circuit court's order. We reverse the circuit court and remand with directions to reinstate the agency decision.

Before the new rule was promulgated, long-term care providers were reimbursed for Medicaid services by flat-rate payments. However, in 1999, the legislature directed DHS, in cooperation with the Arkansas Health Care Association (AHCA)[1] and other interested parties, to "develop a new cost-based nursing facility rate methodology." *See* Act 1537 of 1999, § 127(d). The Act required the new methodology to be submitted to the appropriate federal agency prior to January 1, 2001, so that it might be implemented by July 1, 2001. *Id.*

After the passage of Act 1537, DHS and AHCA worked together to develop the new system. According to Siloam, the most crucial aspect of this process was the calculation of each facility's fair rental value because profit was built into that component. An independent assessment of each facility's value was too expensive for DHS to undertake, and, according to one of Siloam's witnesses, DHS records in this regard were "not very good." Therefore, it was determined that AHCA would collect information about the facilities through surveys. AHCA's data analyst, Lynn Rodgers, sent the surveys to providers requesting the year of licensure; the number of beds; the addition of new beds and the year they were added; the value of any major improvements costing over $76,000.

Through the process of negotiation, the parties agreed that the starting point for determining fair rental value would be a per-bed value of $38,000, regardless of the actual age or value of

---

[1] A trade association for owners of long-term care facilities.

the bed.[2] They also agreed that an aging index or depreciation factor would be applied to each bed, reducing the bed's value by one percent for each year of its age, to a maximum of fifty percent. As an example, the value of a ten-year-old bed would be reduced by ten percent, *i.e.*, from $38,000 to $34,200.

In addition, AHCA and its representatives believed that DHS would adjust the aging index for facilities that had made major renovations in past years. This would mean that, in the case of two facilities of roughly the same age, the facility that had undergone major renovation would have a higher fair rental value than the facility that had not renovated. In light of AHCA's understanding, Lynn Rodgers continued to collect the facility surveys — which contained, *inter alia*, amounts spent on renovation — and passed them along to DHS program administrator Lynn Burton. Rodgers also developed several formulas and models to calculate the impact of major renovations on facility value. According to her and AHCA president Jim Cooper, these models and formulas were discussed and shared with DHS. Indeed, the record contains several pieces of correspondence that Rodgers sent to DHS in the fall of 2000, referencing the effect of major renovations on the aging index and containing formulas to be used in calculating that effect.

Lynn Burton of DHS agreed that she exchanged information with Lynn Rodgers, and she remembered at least some of the above mentioned correspondence. She also acknowledged that she received the surveys collected by AHCA. However, Burton testified that "we weren't going to use" the renovation information provided by AHCA and that, even in the fall of 2000, "I did not believe that major renovations were going to be used in calculating the aging index. As far as I remember, we were never going to be using historical renovations." Nevertheless, Burton did not tell Rodgers or Cooper that the renovation information would not be used or that it should not be sent to DHS.

In January 2001, DHS filed the new methodology with the federal government, and the system was implemented in the spring of 2001. It reflected the parties' agreement that the fair rental component would be based on a per-bed value of $38,000, as

---

[2] As explained by one of Siloam's witnesses, a bed's value is not simply its physical worth but includes the value of other furnishings and costs associated with it and attributable to it, such as dining areas, day rooms, etc.

reduced by an aging index of one-percent per year up to fifty percent. Section 6 of the reimbursement rule, which is at issue in this case, made the following statement with regard to the aging index:

> Age of provider beds for purposes of calculating the aging index were taken from surveys provided by [AHCA] as prepared by providers. The provider is responsible for the accuracy of the information provided. The provider may at any time be required to provide records validating this information. The aging index is subject to adjustment based upon review or audit.

Siloam's witnesses testified that they had no problem with Section 6 as written because it mentioned the surveys, and they therefore assumed that DHS would use the surveys' renovation data to adjust the aging index. As a result, they expressed surprise when, in the spring of 2001, DHS calculated reimbursement rates without considering past renovations.

Siloam, whose survey response reflected over $700,000 in renovations between 1999 and 2001, appealed the rate calculations to a DHS hearing officer. It argued that DHS should have interpreted Section 6 as requiring an adjustment to the aging index based on the renovation data in the survey and the parties' understandings throughout the negotiation process.[3] The hearing officer ruled against Siloam and concluded that the language in the new methodology was clear on its face and supported DHS's implementation. Siloam appealed to Pulaski County Circuit Court, where the judge reversed the agency decision and ordered DHS to adjust Siloam's rate to include "historic or past renovation data." DHS now appeals from that order.

Judicial review of DHS decisions is governed by the Administrative Procedures Act, Ark. Code Ann. §§ 25-15-201 to -218 (Repl. 2002 & Supp. 2005). Section 25-15-212(h) of the Act provides in pertinent part that a court may reverse an agency

---

[3] Siloam also argued at various times in the proceedings below and in its brief on appeal that Section 5 of the rule, which *did* take renovations into consideration, might somehow be applicable. However, during oral argument, Siloam acknowledged that Section 5 concerns prospective renovations only and not pre-2001 renovations. We therefore will not discuss Section 5 any further in this opinion.

decision if the substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the agency's statutory authority;

(3) Made upon unlawful procedure;

(4) Affected by other error or law;

(5) Not supported by substantial evidence of record; or

(6) Arbitrary, capricious, or characterized by abuse of discretion.

On appeal, it is not our role to conduct a *de novo* review of the circuit court proceeding; rather, our review is directed at the decision of the administrative agency. *See Groce v. Director, Ark. Dep't of Human Servs.*, 82 Ark. App. 447, 117 S.W.3d 618 (2003). When conducting our review, we keep in mind that the hearing officer is in the best position to determine the credibility of witnesses and decide the proper weight to give the evidence. *Id.* We also review the entire record and give the evidence its strongest probative force in favor of the agency's ruling. *Ark. Soil & Water Conserv. Comm'n v. City of Bentonville*, 351 Ark. 289, 92 S.W.3d 47 (2002). Finally, we recognize that administrative agencies are better equipped than courts, by specialization, insight through experience, and more flexible procedures, to determine and analyze underlying legal issues affecting their agencies. *Ark. Dep't of Human Servs. v. Schroder*, 353 Ark. 885, 122 S.W.3d 10 (2003).

DHS, as the appellant before this court, argues that the agency's decision was supported by substantial evidence; was not arbitrary, capricious, or characterized by an abuse of discretion; was not in violation of relevant statutory provisions or in excess of DHS's statutory authority. *See* Ark. Code Ann. § 25-15-212(h). However, because our review is directed to the agency's decision, *see Groce, supra*, our analysis on appeal will focus on the arguments made by Siloam, who seeks to reverse the agency. *See, e.g., Ark. Soil & Water Conserv. Comm'n, supra*. Siloam contends that DHS should have interpreted Section 6 to allow for adjustment of the aging index where a provider has made renovations to its facility.

■ We begin with the frequently-cited proposition that an agency's interpretation of its own rules is highly persuasive, although it is not binding on the courts. *Sparks Reg'l Med. Ctr. v. Ark. Dep't of Human Servs.*, 290 Ark. 367, 719 S.W.2d 434 (1986). While we may reject an agency's interpretation of its own rule if the interpretation is irreconcilably contrary to the plain meaning of the rule, *see generally Burlington Indus. v. Pickett*, 336 Ark. 515, 988 S.W.2d 3 (1999), an administrative agency's interpretation of its own rule will ordinarily be upheld unless it is clearly wrong. *See Ark. Prof'l Bail Bondsman Lic. Bd. v. Oudin*, 348 Ark. 48, 69 S.W.3d 855 (2002).

■ Words in an administrative rule or regulation are given their plain and ordinary meaning unless there is an ambiguity. *See Johnson v. Ark. Bd. of Exam'rs in Psychology*, 305 Ark. 451, 808 S.W.2d 766 (1991); *Rowell v. Austin*, 276 Ark. 445, 637 S.W.2d 531 (1982). Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation. *See generally Anderson Gas & Propane, Inc. v. Westport Ins. Corp.*, 84 Ark. App. 310, 140 S.W.3d 504 (2004).

Section 6 of the new reimbursement rule states that the ages of provider beds for purposes of calculating the aging index "were taken from surveys provided by [AHCA] as prepared by providers." Siloam acknowledges that the new rule is correct as written and also states that the language in Section 6 is "clear and understandable," thus making no claim of ambiguity. Rather, Siloam asserts that the language in Section 6 is so clear that DHS should have interpreted it to include consideration of past renovation data. Siloam primarily bases this argument on the section's reference to the surveys, which contained the past renovation data, and on the parties' negotiations prior to the implementation of the rule.

■ We agree that the language of Section 6 is clear, though not in the manner that Siloam suggests. Section 6 makes no mention that a facility's past renovations will be taken into account for any purpose. Even Siloam's financial officer, Jerry Sams, noted that, while such language could be "inferred" in the rule, it was not expressed verbatim. Section 6 states that the age of provider beds was taken from the surveys. The record as abstracted contains at least one survey that lists the provider's beds and the year that the

beds were added to the facility. Thus, Section 6 is little more than an acknowledgment of the fact that DHS obtained the ages of provider beds from the surveys. Its plain language does not contain a renovation adjustment.

■ Moreover, the parties' negotiations did not require that the new rule be interpreted to include past renovations. Although AHCA provided DHS with information on past renovations and the testimony of Siloam's witnesses is replete with statements that they "assumed" or "anticipated" or "thought" that DHS would use the information, they also said that they did not know if all of the information they were providing would be used. More importantly, as we have previously stated, the rule as written simply does not contain language to the effect that the renovation data should be considered. Therefore, DHS did not act unreasonably in refusing to stretch Section 6's language to mean that *all* of the information on the surveys, including historic renovation data, *must be* used.

■ Nor does DHS's purported lack of cooperation in the negotiating process change the clear language of the rule. Although we note that DHS cooperated to some extent by negotiating the per-bed value figure of $38,000 and the one-percent aging index, we again look to the wording of the rule rather than the events leading up to its promulgation. The rule makes no express mention that past renovations will be a factor in determining a facility's initial fair rental value or calculating the aging index.

■ We are sympathetic in some respects to Siloam's arguments, particularly that fairness dictates that providers who have renovated their facilities should have a higher initial rental value that those who have not. However, we do not substitute our judgment for that of the agency. *Groce, supra*. Moreover, in light of the manner in which Siloam has chosen to frame the issues on appeal, *i.e.*, a challenge to the interpretation of the rule rather than the rule itself, we cannot say that DHS's interpretation of the rule was clearly wrong, given its plain language and the witness testimony at the administrative hearing. Thus, in accordance with the Administrative Procedures Act, we do not conclude that the agency's decision was unsupported by substantial evidence; was arbitrary, capricious, or characterized by an abuse of discretion; or

was in violation of relevant statutory provisions or in excess of its statutory authority.[4]

We therefore reverse the circuit court order and remand with directions to reinstate the agency decision. *See Ark. Dep't of Human Servs. v. Ark. Child Care Consultants, Inc.*, 318 Ark. 821, 889 S.W.2d 24 (1994).

Circuit court reversed and remanded; agency decision reinstated.

BIRD and BAKER, JJ., agree.

---

[4] Siloam argued on appeal that the agency's findings of fact were not sufficient to allow review. *See* Ark. Code Ann. § 25-15-210(b)(2) (Repl. 2002). Because our review is directed to the plain language of the rule and the administrative officer concluded that the rule's language was clear, we see no need for further findings.