

# NUMBER 13-19-00238-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

QUINCY MUHAMMED WRIGHT,                                         Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

---

### On appeal from the 24th District Court
### of Jackson County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Tijerina
### Memorandum Opinion by Justice Hinojosa

Appellant Quincy Muhammed Wright appeals his conviction for murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02. A jury found Wright guilty and assessed punishment of ninety-nine years' imprisonment in the Texas Department of Criminal Justice–Institutional Division. In three issues, Wright argues that: (1) the trial court erred in denying Wright's request for a self-defense jury instruction; and (2) abused

its discretion by denying Wright an evidentiary hearing on his motion for new trial and (3) denying Wright's motion for new trial. We conclude that the trial court erred in denying the requested self-defense instruction because the issue was raised by the evidence. Therefore, we reverse the trial court's judgment and remand the case for a new trial.

## I.    BACKGROUND

A grand jury returned an indictment charging Wright with murdering James Steven Barrios by shooting him with a firearm. The evidence at trial established that on the night of November 26, 2017, James[1] entered the apartment of his wife, Marcedise Barrios, by forcibly opening a sliding glass door, pushed his way past Marcedise in the hallway, and proceeded to the bedroom where he confronted Wright, a romantic partner of Marcedise. During the confrontation, Wright fatally shot James with his firearm. As discussed further below, there is conflicting evidence concerning whether James was estranged from Marcedise and whether he had permission to enter her apartment. At trial, multiple law enforcement officials testified concerning the ensuing investigation. The jury also heard varying accounts of the fatal encounter from Marcedise and Wright.

## A.    Investigation

Jeff Tipton, an Edna Police Department officer, was dispatched to the Cottonwood apartments in Edna, Texas around 11:00 p.m. in response to a reported shooting. When Officer Tipton arrived, Marcedise informed him that Wright shot her husband James after James broke into the apartment through the patio door. Officer Tipton discovered James's

---

[1] Because they share a surname, we will refer to James Barrios and Marcedise Barrios by their first name to avoid confusion.

lifeless body on the floor of the master bedroom. He secured the room before speaking with Marcedise and her sister Ebony Woods, who resided nearby. Officer Tipton discovered a bent white rod near the patio door, indicating that someone entered the apartment by forcing open the patio door.

John Lingle, a lieutenant with the Texas Rangers, assisted local law enforcement with the investigation. Lieutenant Lingle spoke with Marcedise and took photographs of the crime scene. Marcedise told Lieutenant Lingle that she heard someone breaking into the apartment whom turned out to be her husband. Lieutenant Lingle proceeded to the bedroom and examined James's body. He observed a gunshot wound to James's face. He believed that the presence of stippling—unburned gunpowder particles—on the body suggested that James was within arms-length of Wright at the time of the shooting. Lieutenant Lingle found a 3 ½ inch closed pocket knife near James's body. A photograph exhibit shows the pocket knife on the floor at the foot of the bed.

Lieutenant Lingle also found a nine-millimeter shell casing on the floor and a baggy in James's pants containing what he believed to be methamphetamine. He learned from Marcedise that James did not have a key to the apartment and that he was not named on the lease. James's driver's license showed a separate address as his residence. Lieutenant Lingle stated that James's forcible entry into the apartment constituted a burglary.

Edna Police Chief Clinton Wooldridge testified that he was present for Wright's grand jury testimony, during which Wright physically demonstrated that James had his fists closed and at his side at the time of the shooting.

3

Forensic pathologist Sam Andrews, M.D., performed James's autopsy. Dr. Andrews concluded that the cause of death was a single gunshot wound to the head. He stated that the bullet entered under the left eye and into the left side of the brain. The presence of stippling on the skin suggested that the bullet was fired from six inches to three feet away. Dr. Andrews testified that James was close to six feet tall and weighed 205 lbs. The toxicology report showed that James had the following substances in his system at the time of his death: methamphetamine, methadone, alprazolam or Xanax, marijuana, and hydrocodone. Gary Wimbish, Ph.D., a forensic toxicologist, testified that the quantity and combination of the narcotics would have made James feel "bullet proof" or "invincible" and would cause James to behave in an aggressive and irrational manner.

**B. Marcedise's Testimony**

Marcedise testified that James was the biological father of one of her three children. She described an on and off relationship with James. James did not have his own key to the apartment, but Marcedise maintained that he had permission to enter the apartment through the sliding glass door. She placed an aluminum security bar in the patio door so that it could not be opened freely from the outside. Text messages between Marcedise and James showed that the two were engaged in the sale of various illicit drugs.

A few weeks before James's death, Marcedise contacted the Houston-based Wright to secure a supply of narcotics. The two became romantic partners upon their first meeting. Prior to November 26, 2017, Marcedise met Wright in person twice—first at a Houston hotel, and the second time at her apartment. Marcedise told Wright that she was

separated from James. Unbeknownst to Wright, she later told James that she was involved with Wright.

On November 26, Wright arrived at Marcedise's apartment around 10:30 p.m. The two proceeded to the bedroom where Marcedise stored drugs provided by Wright as well as the cash proceeds from selling the drugs. While there, Marcedise received a call from James, which she did not answer. Moments later, she heard the patio door opening. Believing that James had entered the apartment, Marcedise went to the hallway to intercept him. Marcedise saw an angry James approach her, and she told him to stop. James pushed his way past her and entered the bedroom. Marcedise heard James say, "Hold up, player" followed by a gunshot. Marcedise told Wright to leave before calling 911.

## C.      Wright's Testimony

Wright's grand jury testimony was played for the jury. According to Wright, Marcedise told him that she and James were separated, and James resided with his mother. On the night in question, Wright recalled hearing glass breaking while he and Marcedise were sitting on the bed. Wright believed someone had broken into the apartment. Marcedise immediately jumped from the bed and entered the hallway, closing the bedroom door behind her. Wright then heard a male voice, and he feared that Marcedise was setting him up to get robbed. At this point, Wright picked up his gun from the dresser and stood up. He repositioned himself because he thought that "if somebody come [sic] in, they could just shoot me if I'd been at the head of the bed." Moments later, an unknown male, whom he later learned was James, entered the bedroom. Wright stood

5

up, pointed the gun at James, and said, "hold up bro." Wright stated that he intended to defuse the situation so he could leave the apartment safely.

James did not say anything and continued approaching Wright. Wright believed that he was "on some drugs or something." He stated that James "never like blinked or nothing[.]" Wright explained, "I ain't never see nobody like you point a gun at him and try to stop him [and] he don't stop." Wright could not tell if James was holding a weapon. He stated he was stuck between the bed and the nightstand, when James stepped forward as if he was going to attack him. At that point, Wright fired his gun, and James fell to the floor. Moments later, Marcedise walked into the room and told him, "go. Hurry up. Go." Wright left the apartment and fled the scene.

Wright stated, "I wasn't trying to kill him[,] but I was just trying to defend myself."

## D.     Jury Charge Conference

Wright requested that a self-defense instruction be included in the jury charge. Specifically, Wright's proposed jury charge included instructions concerning whether Wright was permitted to use deadly force to: (1) protect against the deadly force of another; or (2) prevent the commission of a robbery or aggravated robbery. The trial court denied the requested instructions, and Wright further objected to their omission.

## E.     Jury Deliberations and Verdict

During deliberations, the jury sent the following note to the trial court: "We would like clarification on what constitutes self-defense? [sic] We would like the Texas State Law please[.]" Over Wright's objection, the trial court responded as follows: "I have already ruled that self defense does not apply to this case. That's why self defense was

not in my charge. You are not to consider self defense in your deliberations."

The jury found Wright guilty of murder. Following a punishment hearing, it assessed a sentence of ninety-nine years' imprisonment.

## F.  Motion for New Trial

Wright filed a motion for new trial on the following grounds: (1) the jury charge erroneously omitted a self-defense instruction; and (2) the trial court had repeated ex parte communications with the prosecution concerning the merits of the case. Wright supported his motion with affidavit testimony, and he requested an evidentiary hearing. The trial court held a hearing on the motion, accepted the affidavits into evidence, but declined to hear live testimony. At the conclusion of the hearing, the trial court denied the motion for new trial. This appeal followed.

## II.  SELF-DEFENSE INSTRUCTION

By his first issue, Wright argues that "[t]he trial court erred by denying [him] a self-defense jury instruction[.]" Wright argues he was entitled to the instruction, while noting that the trial court allowed the State to present evidence rebutting the defense. Wright also maintains that the trial court's response to the jury's note regarding self-defense was an improper comment on facts of the case.

## A.  Standard of Review and Applicable Law

The trial court must "instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence." *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007). "Self-defense, like other chapter nine defenses, justifies conduct that would otherwise be criminal." *VanBrackle v. State*, 179

S.W.3d 708, 715 (Tex. App.—Austin 2005, no pet.) (citing *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999)). When reviewing a trial court's denial of a self-defense instruction, we view the evidence in the light most favorable to the requested submission. *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A defendant is entitled to the instruction if the issue is raised by the evidence, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Id*. A defensive issue is raised by the evidence if there is some evidence, regardless of its source, on each element of a defense that, if believed by the jury, would support a rational inference that the element is true. *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007); *Dugar v. State*, 464 S.W.3d 811, 816 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). Whether the record contains such evidence is a question of law; therefore, we do not apply the usual rule of appellate deference to the trial court's ruling. *Shaw*, 243 S.W.3d at 658.

Under § 9.31 of the penal code, a person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a). Under § 9.32(a), a person is justified in using deadly force against another if he would be justified in using force under § 9.31, and

> (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>
>> (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
>>
>> (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault,

8

robbery, or aggravated robbery.

*Id*. § 9.32(a). "Deadly force" is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. § 9.01(3). "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id*. § 1.07(46).

The reasonableness of a defendant's belief that force is immediately necessary is viewed from the defendant's perspective at the time he acted. *Dugar*, 464 S.W.3d at 818. It is not necessary that the complainant was actually using or attempting to use unlawful deadly force against the defendant. *Carmen v. State*, 276 S.W.3d 538, 545 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *see Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984) (noting that the defendant would be entitled to a self-defense instruction if he reasonably believed that his brother was using or attempting to use unlawful force, and it was "immaterial" that the defendant was not in fact attacked by his brother); *Semaire v. State*, 612 S.W.2d 528, 530 (Tex. Crim. App. 1980); *Lavern v. State*, 48 S.W.3d 356, 360–61 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). The record must contain some evidence or "observable manifestations" of the defendant's state of mind at the time of the alleged act of self-defense. *VanBrackle*, 179 S.W.3d at 713 (quoting *Reed v. State*, 703 S.W.2d 380, 385 (Tex. App.—Dallas 1986, pet. ref'd)).

## B.    Error Analysis

Because Wright argues he was entitled to a self-defense instruction under two separate theories, we will address each in turn.

## 1. Responding to Deadly Force

Wright argues that the evidence established that "he reasonably believed his use of deadly force was immediately necessary to protect himself from an . . . intruder's attempted use of deadly force while [he] stood trapped in a bedroom."

Viewing the evidence from Wright's perspective and in the light most favorable to the requested instruction, *see Gamino*, 537 S.W.3d at 510, we note the following relevant facts: (1) Wright heard someone break into the apartment late at night; (2) Marcedise left the room and closed the door behind her; (3) Wright heard a male voice in the living room; (4) the unknown intruder entered the bedroom where Wright was located; (5) Wright did not have a way to escape the room; (6) he told the intruder to "hold up"; (7) he displayed a gun to deter the intruder;[2] (8) the intruder continued toward Wright; (9) the intruder appeared to be under the influence of drugs; (10) he could not tell whether the intruder had any weapons;[3] (11) the intruder, who was six feet tall and weighed 205 lbs., stepped

---

[2] We note that under § 9.04 of the penal code, the threat of force by producing a firearm is justified for the purpose of creating an apprehension that deadly force will be used if necessary. *See* TEX. PENAL CODE ANN. § 9.04. Section 9.04 of the penal code, titled "Threats as Justifiable Force," provides:

> The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

"Section 9.04 is not a separate statutory defense; rather, it is incorporated into the law of self defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). While Wright's *threat* of force by producing the firearm might be justified under § 9.04, his subsequent firing of the weapon constitutes the *use* of deadly force that must be separately justified under § 9.32 of the penal code. *See Pham v. State*, __ S.W.3d __, __, No. 14-17-00400-CR, 2019 WL 5610477, at *6 (Tex. App.—Houston [14th Dist.] Oct. 31, 2019, no pet.).

[3] Because we view the state of the evidence from the perspective of Wright at the time he acted, we do not consider the presence of the pocket knife, which Wright did not claim to see. However, because Wright perceived that James was under the influence of drugs, we do consider Dr. Wimbish's testimony concerning the effect that the particular cocktail of drugs found in James's system would have had on his behavior. *See Dugar v. State*, 464 S.W.3d 811, 818 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). In that regard, we note that Wright's belief that James behaved in a manner consistent with drug use is

10

toward him as if he were going to attack Wright; and (12) Wright fired his weapon when the intruder was close enough to touch him.

The State argues that this evidence establishes only that Wright was reacting to the attempted use of non-deadly force, which does not justify Wright's use of deadly force. It argues that any supposed belief that Wright was reacting to the attempted use of deadly force could be based only on "unfounded speculation" rather than a permissible rational inference from the evidence. We believe the State's argument fails to give due consideration to a number of factors: the nighttime forcible entry into the residence; the aggressive approach by James while staring down a drawn gun; and the outward manifestations of James's drug use. Viewed from Wright's perspective, an unknown intruder, who is intoxicated to the point of feeling bulletproof and invincible, aggressively approaches a cornered Wright despite Wright's display of a firearm and protests for him to stop. This scenario signifies an intent to injure more ominous than suggested by the State.

Given the foregoing circumstances, we conclude Wright offered some evidence to raise an issue as to whether he reasonably believed that use of deadly force was immediately necessary to protect himself against the infliction of serious bodily injury by James. That is, viewing the evidence in the light most favorable to Wright, we conclude the evidence supports a rational inference that Wright's belief was reasonable. *See Shaw*, 243 S.W.3d at 657–58. Accordingly, the trial court erred in failing to submit the instruction to the jury. *See id*.; *see also Carmen*, 276 S.W.3d at 545 (holding that the trial court erred

corroborated by Dr. Wimbish's testimony that the cocktail of drugs in James's system would have made him feel invincible and would cause him to act irrationally.

11

by failing to instruct on self-defense where the defendant feared the complainant was going attack him and had done so before, the defendant pointed a gun at the approaching complainant, the complainant kept coming toward the defendant and threw an object striking the defendant in the shoulder, at which point the defendant fired his gun); *Gilbeau v. State*, 193 S.W.3d 156,159–61 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that the trial court erred by failing to instruct on self-defense when the evidence showed complainant threatened to give the defendant "the beating of a lifetime," the defendant felt shooting "was the only thing [he] could do at that time to save [himself]," and there was not enough time to retreat because complainant came at him "fast").

### 2. To Prevent Robbery

We also conclude that there is "some" evidence that Wright reasonably believed that the use of deadly force was immediately necessary to prevent the imminent commission of robbery. *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(B). A person commits the offense of robbery if "in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id*. § 29.02.

In addition to the factors stated above, we note that there was evidence that a large amount of cash was in the bedroom where Wright was located and that Wright believed Marcedise was setting him up to be robbed when she left the bedroom and closed the door behind her. Furthermore, "the presumption of an intent to commit theft arises from the nonconsensual nighttime entry of a home or building." *Brown v. State*, 122 S.W.3d

12

794, 800 (Tex. Crim. App. 2003). This presumption was triggered by James's forcible entry and supports Wright's stated belief that the unknown intruder intended to commit a theft through the use of force.

Viewing the evidence in the light most favorable to Wright, we conclude the evidence supports a rational inference that Wright reasonably believed the use of deadly force was immediately necessary to prevent the imminent commission of robbery. *See Shaw*, 243 S.W.3d at 657–58. Accordingly, the trial court erred in failing to submit the instruction to the jury. *See id*.; *see also Black v. State*, No. 01-94-00354-CR, 1995 WL 431636, at *4 (Tex. App.—Houston [1st Dist.] July 20, 1995, no pet.) (mem. op., not designated for publication) (holding that the defendant was entitled to a § 9.32(a)(2)(B) instruction where he fired his gun at the complainants after they approached the defendant outside a grocery store and told defendant, in effect, to lay on the ground while reaching under their shirt).

## C.    Harm Analysis

When, as here, jury charge error is preserved at trial, the reviewing court must reverse if the error caused some harm. *Rogers v. State*, 550 S.W.3d 190, 191 (Tex. Crim. App. 2018); *Cornet v. State*, 417 S.W.3d 446, 449 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). "Some harm" means actual harm and not merely a theoretical complaint. *Rogers*, 550 S.W.3d at 191. Reversal is required if the error was calculated to injure the rights of the defendant. *Id*. at 192; *Almanza*, 686 S.W.2d at 171. In evaluating harm, we review the whole record, including the jury charge, the state of the evidence, the arguments of counsel, and other relevant

13

information. *Almanza*, 686 S.W.2d at 171.

The Court of Criminal Appeals has recognized that the erroneous omission of a confession-and-avoidance defense, such as self-defense, "is generally harmful because its omission leaves the jury without a vehicle by which to acquit a defendant who has admitted to all the elements of the offense." *See Cornet*, 417 S.W.3d at 451. In this case, Wright's entire defense was premised on a self-defense theory. Wright's attorneys discussed the theory during voir dire and opening statements. Wright admitted to the conduct forming the basis of the offense in furtherance of the defense. The denial of the instruction left the jury with no option but to convict. This is demonstrated by the jury's note stating: "We would like clarification on what constitutes self-defense? [sic] We would like the Texas State Law please[.]" The trial court's response instructing the jury to not consider self-defense further reinforces this point.

Having considered all of the pertinent factors, we conclude that the trial court's error resulted in some harm, not merely theoretical harm. *See Dugar*, 464 S.W.3d at 822 (concluding that the erroneous omission of a self-defense instruction resulted in some harm); *Carmen*, 276 S.W.3d at 546–47 (same); *Johnson v. State*, 271 S.W.3d 359, 368–69 (Tex. App.—Beaumont 2008, pet. ref'd) (same); *Guilbeau*, 193 S.W.3d at 161 (same); *VanBrackle*, 179 S.W.3d at 716–17 (same).

We sustain Wright's first issue. Due to our resolution of this issue, we need not address Wright's remaining issues. *See* TEX. R. APP. P. 47.1.

### III. CONCLUSION

We reverse the judgment of the trial court and remand the case for a new trial.

14

                                                    LETICIA HINOJOSA
                                                    Justice

Do not publish.
Tᴇx. R. Aᴘᴘ. P. 47.2(b).

Delivered and filed the
19th day of March, 2020.